**RADIOPTICS, INC.**

v.

**The UNITED STATES.**

No. 369–75.

United States Court of Claims.

Decided April 30, 1980.

William F. Dudine, Jr., New York City, attorney of record, for plaintiff. Darby & Darby, New York City, of counsel.

Donald E. Townsend, Washington, D. C., with whom was Asst. Atty. Gen. Alice Daniel, Washington, D. C., for defendant. Richard J. Webber, Thomas J. Byrnes and Robert Marchick, Washington, D. C., of counsel.

Before COWEN, Senior Judge, and DAVIS and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on the parties' exceptions to the recommended de-

cision of Trial Judge Francis C. Browne, filed April 12, 1979, pursuant to Rule 134(h), having been submitted on the briefs and oral argument of counsel. Upon consideration thereof, since the court agrees with the trial judge's recommended opinion and conclusion, as hereinafter set forth,* it hereby adopts the same as the basis for its decision in this case. It is therefore concluded as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF TRIAL JUDGE

BROWNE, Trial Judge:

Plaintiff, Radioptics, Inc. (Radioptics), seeks relief under 28 U.S.C. § 1491 for alleged taking by the United States of America (defendant) of certain proprietary information and trade secrets which Radioptics contends were disclosed to defendant in confidence but were used by or for defendant in breach of such confidence, without justly compensating Radioptics.

Radioptics bases its claim principally upon breach of a contract, implied in fact. Alternatively, it alleges a taking of its property rights in its proprietary information and trade secrets for public use without just compensation as required under the fifth amendment to the Constitution of the United States.

In brief, Radioptics contends that it disclosed to defendant in confidence the concept of using lasers in a process for separating isotopes of uranium, and that defendant used and disclosed that concept to others without Radioptics' consent and without compensating Radioptics for its rights in the property thus allegedly taken.

Defendant denies that it has taken or made unauthorized use or disclosure of any proprietary information or trade secrets disclosed by Radioptics to defendant. Defendant contends that, in any event, Radioptics had no protection-susceptible right in any proprietary or trade secret information which was disclosed to defendant by Radioptics. Moreover, defendant asserts that even if Radioptics had a protection-susceptible right, the present action is barred by the statute of limitations or by application of the doctrine of laches.

■ Radioptics has failed to establish by competent evidence that a contractual relationship existed, in fact, between Radioptics and defendant or that there was a taking by defendant of any property of Radioptics within the meaning of the fifth amendment to the Constitution of the United States. Accordingly, we hold for the defendant and dismiss the petition.

### I. Summary of Facts

#### A. Disclosure to Defendant

In March 1963, Dr. Leonard R. Solon, an officer of Radioptics, and Dr. James G. Beckerley, his consultant, met with some of the officials of the Atomic Energy Commission (AEC) in Germantown, Maryland, to persuade the AEC to provide funds to enable Radioptics to conduct a research program relating to the separation of uranium isotopes by use of lasers.[1] Radioptics contends that the AEC representatives with whom they met requested or otherwise induced Radioptics to submit a solicited proposal. Defendant contends, however, that the AEC representatives did not request a proposal but, rather, left it up to Radioptics to decide whether or not to submit an unsolicited proposal. There is no evidence that the AEC representatives ever issued a written request for a proposal. On the other hand, the testimony is in conflict as to whether or not an oral request was made by the AEC personnel. The evidence does es-

---

* The court does not adopt the trial judge's separate findings of fact but his adopted recommended opinion contains such facts as are necessary to the decision.

1. There are two methods by which private companies obtain Government funds to support proposed research projects other than by competitive bidding. One is for the company or companies desiring support to submit "unsolicited" proposals to the agency concerned. The other is for the Government to request submission of proposals. In either case, if the agency decides to support the proposed research, a formal contract is then prepared and executed by the parties.

tablish that the AEC representatives indicated that they would give consideration to a proposal (be it solicited or unsolicited) if submitted by Radioptics. As of the time Radioptics left the conference, there had been no mutual understanding that the AEC would fund the proposed research, but only that AEC would give consideration to a proposal, along with other proposals which were competing for the limited funds available to the AEC for research and development relating to isotope separation.

In April 1963, as a consequence of the March meeting, Radioptics submitted to Dr. Paul W. McDaniel, Director of the AEC Division of Research, Washington, D. C., six copies of a research proposal. The proposal was entitled "An Investigation into the Feasibility of Photochemical Isotope Separation Using Optical Maser Action (with Particular Application to the Separation of U–235 from Natural Uranium)." Radioptics identified the proposal by the symbol "P–103."

2. Molecules of elemental uranium are composed of atoms which, in turn, are composed of a combination of protons, neutrons, and electrons. All uranium atoms have 92 protons; hence, uranium is identified by the atomic number "92." However, not all uranium atoms have the same number of neutrons. Some atoms have 143 neutrons, while others have 146 neutrons. The respective atoms are referred to as "isotopes." They are designated as U–235 and U–238, respectively (the number 235 being the sum of the 92 protons and 143 neutrons of the one atom, and the number 238 being the sum of the 92 protons and 146 neutrons of the other atom). Uranium, as it is found in nature, contains about 99.3 percent U–238, and about 0.7 percent U–235. The U–235 isotope is fissionable and thus useful in nuclear applications. The U–238 isotope, being nonfissionable, must be separated from the U–235 isotope if recovery of fissionable material is alone desired.

3. Since the two isotopes are practically indistinguishable in most of their properties, separation and recovery of the isotopes is exceedingly difficult. The commonly used industrial process is the "gaseous diffusion" process. In that process, separation is based on minute differences in the masses (atomic or molecular weight) of the two uranium isotopes. However, the cost of operating this process is extremely high.

## B. Contents of Proposal P–103

Radioptics set forth in its proposal P–103 an outline for an initial exploratory investigation into the feasibility of using lasers for the separation of uranium isotopes.[2] The proposal was not, however, intended to be a definitive procedure for separating uranium isotopes. Radioptics was cognizant of the fact that a number of difficult problems had to be overcome before the process could be used successfully.[3] Thus, Radioptics had not, as of the time of submission of P–103 to the AEC, developed or tested a technically proven process for the separation of the U–235 and U–238 isotopes of uranium.

## C. Notice of Proprietary Claim

On the page following the title page of the P–103 proposal, as submitted to the AEC in April 1963, the following legend appeared:

### PROPRIETARY INFORMATION

This proposal contains information relating to novel proprietary processes

Separation of uranium isotopes by use of a laser is accomplished by utilizing the subtle differences in the energy absorption characteristics of the respective isotopes rather than their masses. Energy absorption is the ability of an atom or a molecule to absorb light energy by becoming "excited." However, a necessary condition for absorption of light energy is that the strength of the light energy must be at a precise level. If it is too weak or even too strong, no absorption will occur. What that precise level of energy will be varies from one type of atom or molecule to another and generally depends on the particular structure of the element. Thus, the energy level required for light absorption by U–235 will differ, perhaps only slightly, from that required by U–238, as they have slightly different structures.

If a beam of laser energy is directed at uranium molecules as they occur in nature, and the energy level of the beam is precisely matched ("tuned") to the energy absorption level of U–235, only the U–235 will absorb the light energy and become "excited." By differentiating between those atoms or molecules which are or are not "excited," the U–235 isotopes can be separated from the U–238 isotopes. The laser is uniquely suited as a light source for this purpose because it can produce a light beam having a well-defined and adjustable energy level.

and/or trade secrets and/or design data and/or proprietary data and/or apparatus which are the sole property of Radioptics, Inc. regardless of whether or not patents thereon have been or will be applied for. Such information is disclosed herein to the U.S. Atomic Energy Commission in confidence and upon the condition that none of such processes, trade secrets, designs, data, apparatus, or other information will be utilized or copies reproduced except for purposes of evaluating this proposal. If a contract is awarded to Radioptics, Inc. as a result of or in connection with the submission of such data, the Government will have the right to duplicate, use, or disclose this data to extent stipulated in the contract.

The information submitted herein also constitutes disclosure to the Government of a new method of manufacturing special nuclear material, such disclosure being required under the Atomic Energy Act of 1954.

#### D. Security Classification of Proposal P–103

Shortly after receiving the proposal, the AEC Division of Research forwarded one of the six copies for statutory security classification review [4] to Dr. C. L. Marshall, Director of the AEC's Division of Classification. Another copy was sent to Mr. Roland Anderson, the AEC in-house Assistant General Counsel for Patents, for his files. The record does not indicate what disposition, if any, was made of the other four copies of the proposal at that time.

Dr. Marshall determined that the proposal contained information which came within the definition of "Restricted Data" under the Atomic Energy Act of 1954 and ordered it classified accordingly.[5] The order of classification was transmitted by Marshall to the Division of Research and to Anderson with a cover memorandum. The memorandum included a specific request that Marshall be notified if the Division of Research decided *not* to sponsor the proposal.

Radioptics was promptly informed of the classification decision and was advised that it would have to provide prescribed storage facilities for copies of the proposal which it had retained to maintain security of the information. Additionally, Radioptics was told that it must obtain AEC permission prior to disclosing the contents of the proposal to anyone outside the company. However, Radioptics was not required to obtain permission if it merely wished to disclose the nature of the proposal in very general terms to outside investors or the like.

In accordance with its established practice, AEC affixed to each page of each copy of the submitted proposal the stamped notation "CLASSIFIED."

#### E. Evaluation of Proposal P–103

Having settled the matter of classification of the proposal, the AEC wrote Radioptics in June 1963 requesting permission to disclose the contents of P–103 to persons outside the AEC *solely for the purpose of technical evaluation.* Although such permission was implicit in the "Proprietary Information" legend appearing in the proposal, Radioptics expressly granted permission, in writing, repeating that such disclosure would be solely for the purpose of technical evaluation and stating that the permission was not intended to constitute a waiver of any proprietary or patent rights in P–103. After receipt of the written permission from Radioptics, the AEC forwarded one copy of P–103 to Professor John Dieke at Johns Hopkins University, Baltimore, Maryland, and another copy to Mound Laboratory, Miamisburg, Ohio (a laboratory operated by Monsanto Chemical Company under contract with AEC), for the purpose of obtaining their respective opinions as to the technical feasibility of the process proposed in P–103, since such feasibility was a prerequisite to funding of a contract for the work.

---

4. 10 C.F.R. § 95, *et seq.* (1963) required security review and classification of all data concerning production of special nuclear material.

5. It is undisputed that the security classification of P–103 was proper.

Dr. Dieke's review of P–103 indicated that a number of serious problems existed that would be likely to preclude successful application of the P–103 laser process to uranium isotope separation. He concluded by saying that he felt that the authors of the proposal had no detailed knowledge of the field beyond that which could be readily obtained from the general literature. Nevertheless, it was implicit from the application of the word "Confidential" to each page of his report that he had treated the contents of the proposal as confidential matter.

The conclusions expressed in the Mound Laboratory report were essentially the same as those of Dr. Dieke. The Mound Laboratory report stated that the proposal did not contain any basic information which had not previously been studied either during the "Manhattan Project" or at Mound Laboratory, itself. It concluded by pointing out the failure of the proposal to consider the complexity of many of the unsolved problems which so far had been obstacles to the successful utilization of processes similar to those disclosed in P–103. Although copies of this report were circulated among various Monsanto personnel within the Mound Laboratory and the report summarized many of the details disclosed in P–103, the affixation of confidential markings to the report, as well as language in the report itself, clearly indicated that both the authors and the recipients understood that the documents were to be treated as containing confidential matter.

F. *Prior Disclosures of Isotope Separation Technology*

Prior to the date in 1963 on which Radioptics submitted P–103 to the AEC, a number of publications and writings, both classified and unclassified, broadly disclosed the principles of the process disclosed in P–103. These disclosures included:

(a) an article published in *Scientific American* in June 1961 which disclosed that a strong source of infrared radiation at the proper frequency could be used to excite vibrations in a particular species of molecule and that the excited molecule would react more vigorously than the others;

(b) an article published in *Bell Laboratory Records* in 1960 which disclosed that a powerful laser (maser) could be used to excite a particular molecular structure vigorously enough so that selection may then be possible to influence the course of chemical reactions;

(c) a textbook [6] published in 1961 which disclosed that the use of an intense light source with a narrow spectral band had the potential for successfully separating isotopes of uranium;

(d) an article published in 1962 in *Nucleonics* which implicitly taught that a laser might be an acceptable type of light source for the uranium isotope separation process disclosed in the textbook referred to above in paragraph (c); and

(e) a classified report issued by Mound Laboratory in 1961 which related to work performed under an AEC contract and which disclosed that an intense narrow-band radiation source, in theory, could selectively excite one isotope of uranium preferentially over any of the others present. Subsequent research efforts during that year at Mound were specifically directed to the use of a laser beam as a source of that narrow-band radiation.

G. *Declassification of Disclosures of Laser Separation of Isotopes*

A notice published in the *Federal Register* in 1967 [7] informed the public that the AEC had declassified all matters relating to research and development work directed to all methods of isotope separation by processes other than gaseous diffusion or gas centrifugation except those methods which appeared to possess a "reasonable potential for the practical production of special nuclear material in substantial quantities." This change in classification did not, *ipso facto*, constitute automatic de-

6.  H. London, Separation of Isotopes (1961).

7.  32 Fed.Reg. 20868, *et seq.* (1967).

classification of each previously classified document. Rather, any previously classified document would be declassified only upon request. Such requests, however, were usually those made by the authors of the documents.

Two years later, on May 6, 1969, U.S. Patent No. 3,443,087 issued to Robieux, *et al.* The patent disclosed the use of lasers in a separation process for uranium isotopes. A counterpart of this patent had already issued in France in 1965 as French Patent No. 1.391.738 to which reference was made in the later-filed U.S. application for the purpose of claiming priority.

In 1970, U.S. patent application Serial No. 25,605 was filed by Levy, *et al.* This application was initially placed under a secrecy order pursuant to applicable law,[8] but very soon thereafter the secrecy order was vacated. After the secrecy order was vacated, the application was permitted to issue to Avco-Jersey on November 13, 1973, as U.S. Patent No. 3,772,519.

The Levy, *et al.* patent is of special interest in this case since Radioptics claims that the subject matter disclosed in this patent by Avco-Jersey is so similar to the alleged proprietary information and trade secrets disclosed in P–103 that issuance of the patent destroyed the value of Radioptics' proposal P–103 by divulging the proprietary information and trade secrets embodied in its proposal.

### H. *Inquiry by Radioptics as to Status of Proposal P–103*

At about the time the Levy, *et al.* patent application was filed, namely in May 1970, Pacific Northwest Laboratory (Battelle) published an unclassified report which summarized research work which it had done in connection with laser separation of isotopes under contract with AEC. Radioptics thus learned for the first time, when the Pacific Northwest Laboratory report came to its attention, that AEC was actively supporting research in this area of technology.

8.  35 U.S.C. § 181.

9.  Based on the chronology of events, it may be reasonably inferred that the action was taken

### II. *Administrative Claim*

On December 7, 1971, Radioptics wrote to the AEC inquiring as to AEC's action, if any, with respect to the status of its proposal P–103 and also noted that, since submission of the proposal, Radioptics had not received either a rejection or acceptance of the proposal. This was the first time that Radioptics made a specific inquiry as to the status of its proposal P–103 since its submission to AEC in 1963. The AEC's Division of Research replied on December 17, 1971, stating that although P–103 was no longer under active consideration by the AEC, they were unable to document completely the precise fate of the proposal since they were unable to locate any record of an express rejection or acceptance of the proposal. However, a copy of P–103, upon which the original classification was based, was located in the AEC files some time after the inquiry was made by Radioptics in 1971. Although it was the normal practice of the Division of Research to notify a party submitting a proposal of the rejection thereof (if rejected), there is no evidence that either the submitting party (Radioptics) nor the Division of Classification (which had requested that it be notified in the event of rejection) was ever notified of a rejection.

### III. *Defendant's Alleged Unauthorized Disclosure*

The AEC Division of Classification (for reasons which were not made clear at trial), requested an outside confidential review of P–103 on December 22, 1971, to determine whether or not the disclosed process was beyond technical feasibility (*i. e.*, had no "reasonable potential for the practical production of special nuclear material in substantial quantities"), and thus properly subject to declassification under the 1967 declassification guidelines.[9] Based upon the review received, the Division of Classification authorized declassification of all copies

as a consequence of Radioptics' inquiry earlier that month.

of P–103. Radioptics was notified of this decision in February 1972. Thereafter, a flurry of letters was exchanged between Radioptics and the AEC (including a letter to the then Chairman, James Schlesinger), all relating to Radioptics' unsuccessful effort to determine the fate of its proposal P–103. Having failed to obtain relief though administrative channels, Radioptics finally filed suit in this court on October 17, 1975 for compensation for defendant's alleged breach of implied contract or taking of its property.

### IV. Defendant's Alleged Use of Confidential Information or Trade Secrets

In addition to the alleged unauthorized disclosure of P–103 outside the AEC, Radioptics alleges that there were three instances of unauthorized *use* of Radioptics' proprietary information and trade secrets by defendant. Specifically, it alleges that the Mound Laboratory personnel who, while under contract with defendant, originally reviewed P–103 in 1963, used the information disclosed in P–103, either intentionally or unintentionally in subsequent work which was not limited to evaluation of the proposal. Further, it is charged that two other Government contractors, Los Alamos Laboratory and Lawrence Livermore Laboratory, used and are still using the essence of the process disclosed in P–103, with variations.

With respect to the work at Mound Laboratory, as already noted, the basic framework for the idea of using lasers to separate uranium isotopes was known by workers within the lab prior to the submission of P–103. Further, beyond the existence of a mere conception of the idea of possibly using lasers to separate uranium isotopes and some experimental work with lasers, *per se*, the evidence fails to establish that Mound Laboratory personnel ever actually directed a laser beam at uranium material for the purpose of isotope separation.

The work which began in 1970 at Los Alamos Laboratory specifically related to utilization of a laser in the separation of uranium isotopes. Plaintiff, however, has failed to establish by probative evidence that Los Alamos Laboratory personnel involved in this project had ever seen P–103 or even communicated, either orally or in writing, with anyone who had. Thus, if lasers were used at the Los Alamos Laboratory, such use did not involve any information derived from P–103.

The virtually contemporaneous work at Lawrence Livermore Laboratory also related to the utilization of lasers in the separation of uranium isotopes. The only connection which Radioptics was able to establish at trial between anyone having knowledge of the contents of P–103 and the Livermore personnel was that the member of Mound Laboratory, who was responsible for supervising the review of P–103 in 1963, attended a meeting in 1972, chaired by Dr. Ray E. Kidder, the head of the Lawrence Livermore Laboratory project at that time. Although the evidence indicates that the meeting included a discussion of lasers for use in separating uranium istopes, Dr. Kidder testified that he never met personally with any Mound Laboratory personnel prior to the trial, and that he had begun work which related to the laser project in 1962, before P–103 was ever submitted to AEC.

### V. Theories of Liability

#### A. Breach of Contract

Radioptics' first theory of liability is that the Government committed a breach of contract, implied in fact,[10] by using and/or disclosing to others the process disclosed in P–103, without obtaining Radioptics' permission. The implied contract, Radioptics claims, came into existence between Radioptics and the AEC because the AEC, by receiving and accepting custody of proposal P–103, as submitted, was bound by the terms set forth in the "Proprietary Information" clause which clearly appeared on the second page of the proposal. It is further asserted that the AEC affirmatively acknowledged the confidentiality of the proposal by its subsequent treatment of the

---

**10.** This court lacks jurisdiction of claims for breach of contracts implied at law. *E. g., Jan-* *kowitz v. United States*, 209 Ct.Cl. 489, 506 at n. 12, 533 F.2d 538, 548, at n. 12 (1976).

document. We find, however, that the AEC never violated any of the restrictions sought to be imposed on the AEC by Radioptics and that the acts of the AEC were insufficient to constitute an implied-in-fact acceptance of the terms [11] of the unilateral caveat set forth in the "Proprietary Information" clause. Thus, no contract was entered into between Radioptics and the AEC relating to the confidentiality of proposal P–103. Moreover, even if a contract came into being under the facts set forth, the legend which Radioptics included on the second page of its proposal P–103 clearly indicated that the document contained information which it considered to be the "sole property of Radioptics, Inc." [12] The legend also contained a unilateral caveat to the effect that the information was being disclosed to the AEC "in confidence." [13] The AEC was expressly authorized, however, to use the information and to make copies of the proposal "for purposes of evaluating this proposal." [14]

The proposal did not, however, constitute an offer to sell to the AEC the information contained therein, but was submitted for the purpose of inducing the AEC to award a contract to Radioptics for research and development work directed to the concept disclosed in the proposal, namely, the use of lasers in the separation of the U–235 and U–238 isotopes of uranium. The legend provided that *if* a contract was to be awarded, the right of the Government to "duplicate, use, or disclose" the information would be "stipulated in the contract." [15] Thus, it is clear that *no* agreement was reached with respect to use of the information beyond that required for the purpose of evaluating the feasibility of the work which Radioptics proposed to do if awarded a contract.

■ Radioptics claims that if the express terms of the caveat were unacceptable to the AEC, P–103 should not have been used for *any* purpose but, instead, should

have been returned to Radioptics immediately. Not having done so, Radioptics contends that the facts establish acceptance of the terms by the AEC by implication. The general rule, however, is to the contrary: Silence may not be construed as an acceptance of an offer in the absence of special circumstances existing prior to the submission of the offer which would reasonably lead the offeror to conclude otherwise. *See,* 1 Williston On Contracts, § 91 (3d ed. 1957). Not only were there no such special circumstances in the present case, but Radioptics conceded that the AEC was never notified *prior* to the submission of P–103 that it would contain trade secret or proprietary information. Accordingly, we hold that the AEC's failure to have affirmatively rejected the terms set forth in the "Proprietary Information" legend did not create an implied-in-fact contract embodying those terms.

■ Radioptics also maintains that receipt and retention of its proposal by AEC established a contractual relationship since the AEC, in fact, treated the proposal as confidential at all times while it was in the custody and under control of the AEC. However, there was an independent reason for the AEC to accord confidential treatment to P–103. Specifically, 42 U.S.C. § 2181(c) required any person who had made a discovery useful in the production of special nuclear material to file a report with the AEC describing that discovery. Once filed, the AEC was bound under 42 U.S.C. § 2181(e) to keep the report confidential and not to disclose its contents without authority of its inventor or owner. Thus, independently of any unilaterally imposed obligation expressed in the proprietary legend, the AEC was bound by law to keep the contents of the proposal confidential. The fact that it did, therefore, evidenced only its compliance with the law, not its acceptance of a contract based on the

---

11. *See* text of alleged terms at pp. 4–5, *supra.*

12. *Id.*

13. *Id.*

14. *Id.*

15. *Id.*

terms set forth under the proprietary legend.

Although Radioptics gave blanket permission to the AEC to disclose the contents of the P–103 document to others for the purpose of evaluating the technical feasibility of the proposal,[16] the AEC nevertheless wrote to Radioptics (shortly after receiving the P–103 proposal) expressly requesting permission to disclose the contents of the proposal to persons outside of the AEC for such purposes. This request is further evidence of the fact that the AEC was not acting pursuant to the terms of the "Proprietary Information" clause, but rather was acting solely in accordance with the statutory requirements of 42 U.S.C. § 2181(e). We conclude, therefore, that the affirmative recognition of the confidentiality of P–103 was not an act which created an implied-in-fact contract between the AEC and Radioptics.

The fact that the AEC actually sought outside review of P–103 is also not, in our view, persuasive evidence of acceptance of a contractual obligation. The terms of the proprietary legend failed to specify either that evaluation would constitute acceptance of the terms under the proprietary legend (in a contractual sense) or that a duty was imposed upon the AEC to make an evaluation or even to inform Radioptics of its decision regarding the award or lack of award of a contract. The most that can be said of the act of the AEC in obtaining outside review of the proposal is that the AEC merely fulfilled the gratuitous promise its officials made at the first meeting with Radioptics to give consideration to a proposal from Radioptics, if submitted.

Radioptics contends that the decision of this court in *Padbloc Co. v. United States*, 161 Ct.Cl. 369 (1963), is controlling in the present case. In *Padbloc*, following 3 days of negotiation with the Government, Padbloc prepared a detailed document which was intended to be the text of a written agreement between itself and the Government. Among other things, the document specified that if the Government would des-

ignate Padbloc's bomb casing as the *only* approved alternate to a certain bomb casing already in use, Padbloc would, in turn, supply the Government with the necessary drawings, specifications, and know-how to enable the Government to inspect the casings they received from Padbloc's manufacturing plant. The document represented that the information Padbloc was promising to supply was considered by Padbloc to be a trade secret and would be disclosed to the Government only upon condition that it would be used solely for evaluation purposes.

After receiving the document, the Government did not sign it but, instead, wrote Padbloc and stated that in accordance with its letter, they had designated Padbloc's casing as an approved alternate, and requested that Padbloc submit all of the promised disclosure material.

In response, Padbloc promptly supplied the material. Thereafter, however, the Government did not limit its use of the material solely to evaluation purposes and, as a result, a suit was brought by Padbloc for breach of contract by the Government.

In rejecting the Government's assertion that there had been no acceptance and, therefore, that there was no valid contract, this court stated that, although the Government's return letter did not, in so many words, accept the agreement, the Government nevertheless, by its subsequent acts, impliedly promised to abide by the terms of the document. *Id.* at 378. This implied promise existed because the Government reasonably led Padbloc to conclude that, even in the absence of a signed contract, the Government nevertheless had accepted his offer.

In the present case, however, as we already have pointed out, nothing the AEC said or did was sufficient to give Radioptics reasonable grounds to believe that the AEC was promising to abide by the terms of the proprietary legend and, in fact, the letter requesting permission for outside disclosure, if anything, implied that the AEC had ig-

16. *Id.*

nored the unilaterally asserted terms. If a contract had been awarded, the contract would have spelled out the respective rights of the parties. Absent such a contract, there is no evidence whatever as to the rights which might have been granted if there had been a meeting of the minds and a contract had been executed.

Even if this court were to find that certain members of the AEC did accept the terms under the proprietary heading, Radioptics has not established that any of these persons had authority to bind the U.S. Government to compensate Radioptics for the use or disclosure of the ideas contained within the proposal. Absent proof of contracting authority, the Government cannot be held liable. *See Housing Corp. v. United States,* 199 Ct.Cl. 705, 468 F.2d 922 (1972); *Grismac Corp. v. United States,* 214 Ct.Cl. 39, 556 F.2d 494 (1977).

Moreover, the meager evidence which has been presented concerning the authority of the AEC personnel to bind the Government tends to demonstrate that no member of the AEC or its contractors who had seen P–103 had authority to bind the Government to compensate Radioptics for the use or disclosure of the ideas contained within the proposal. In this respect, the facts in the present case are further distinguishable from those in *Padbloc* for, in that case, the party found to have accepted Padbloc's offer was a duly authorized *contracting officer.*

What perhaps is most significant and most clearly sets this case apart from *Padbloc* is that Radioptics has utterly failed to prove that the Government has, in fact, violated any of the restrictions or obligations which Radioptics sought to impose unilaterally by the terms set forth under the proprietary legend. The source of the alleged obligations is found in the second sentence of the proprietary legend, which reads as follows:

Such information is disclosed herein to the U.S. Atomic Energy Commission in confidence and upon the condition that none of such processes, trade secrets, designs, data, apparatus, or other informa-

tion will be *utilized* or *copies reproduced except for purposes of evaluating this proposal.* [Emphasis supplied.]

Radioptics contends that the meaning of this sentence is that the AEC could not disclose or use any of the information or ideas embodied in the proposal *except for evaluation purposes.* While the *use* restriction is expressly stated in the sentence, a restriction on *disclosure* may be derived therefrom only by implication. Reading the clause in its entirety and considering the circumstances under which the proposal was submitted, we feel that the "in confidence" restriction, when combined with the restriction on use and reproduction of copies, is sufficient to encompass a restriction on disclosure. Accordingly, we agree with Radioptics' interpretation of this sentence.

With respect to the *use* restriction, Radioptics alleges that this restriction was violated by the personnel of three laboratories which were under Government contract. Specifically, Radioptics points out that the Mound Laboratory (Monsanto) personnel who originally reviewed P–103 in 1963 used the information disclosed in the proposal in subsequent work sponsored by the Government, and that personnel at Los Alamos Laboratory and Lawrence Livermore Laboratory subsequently used variations of the process disclosed in P–103 in their own work under Government contracts. However, in each case, Radioptics has failed to support its allegation with sufficient evidence to support a conclusion that the respective contractors used Radioptics' documents or copies thereof when they utilized information or processes corresponding to those set forth in P–103. The evidence indicates that the information and processes used were either original work of the personnel, derived from information in the public domain at the time they were used, or derived from independent research of the contractors.

With respect to the work at Mound Laboratory, the evidence fails to establish that even though lasers were investigated, a laser beam was never used to separate isotopes of uranium-bearing material. The most

that the evidence establishes is that efforts were made to "tune" lasers to standards which could be employed in uranium isotope separation. Moreover, the evidence shows that, even prior to the submission of P–103 to the AEC, the basic concept of using lasers to separate uranium isotopes was derived from information already in the public domain by workers within that laboratory. Thus, we conclude that their conception of the use of lasers in uranium isotope separation did not come from P–103. It was on the basis of their prior knowledge of the technology that they were qualified to evaluate P–103 and upon which they concluded that the subject matter of P–103 had sufficient merit to warrant further investigation.

The work at Los Alamos Laboratory which began in 1970 (7 years after the submission of P–103), did involve the utilization of a laser in a uranium isotope separation process. Radioptics, however, has failed to establish that anyone involved in this project had ever seen P–103, or had even conversed with anyone who had seen it.

The work at Lawrence Livermore Laboratory also involved the utilization of lasers in the separation of uranium isotopes. In an effort to establish that personnel of that laboratory were informed of the contents of P–103, Radioptics offered proof that one of the members of the Mound Laboratory staff, who was responsible for supervising the review of P–103 in 1963, attended a meeting in 1972 (9 years later) which was also attended by Dr. Kidder, the head of the Lawrence Livermore Laboratory project at that time. Although the meeting did include a discussion of the use of lasers in uranium separation processes, Dr. Kidder testified that he was not aware of ever having met any Mound Laboratory personnel at the meeting in 1972 or at any other time prior to the trial of the present case. He testified further that, in any event, he had begun work related to lasers in 1962, which was prior to the date the P–103 proposal was prepared.

With respect to the laser processes for separation of uranium isotopes at Los Alamos and Lawrence Livermore Laboratories, Radioptics urges that proof of access to the P–103 document, coupled with proof of similarity of subject matter, is sufficient to create an inference of copying of the documentation or use of the subject matter disclosed therein. However, even assuming the applicability of this copyright infringement test to the law of trade secrets, Radioptics has utterly failed to offer sufficient proof of *access* from which this court could draw an inference of copying by Los Alamos or Lawrence Livermore personnel. About the only probative evidence offered by Radioptics on this point is that, on occasion, workers from these various laboratories would converse with one another during technical discussions about various aspects of the work that they were doing, none of which related to laser separation of uranium isotopes. However, when this highly circumstantial evidence is balanced against the fact that P–103 was, at most, a marginal advancement over the state-of-the-art at the time of its submission; that P–103 received reviews which were highly critical of the feasibility of the process disclosed in the proposal, and that all communications regarding the contents of P–103, including P–103 itself, were marked "CONFIDENTIAL," we are not constrained to draw the inference that information from P–103 was the source of any discussion on the subject of the use of lasers in separation of uranium isotopes between personnel of these laboratories, even if it were established that such discussions took place.

With respect to the restriction against disclosure, Radioptics alleges that the Government violated the terms of the restriction by sending a copy of P–103 to a potential competitor of Radioptics, Monsanto's Mound Laboratory. The contention disregards the contractual privity which already existed between AEC and Monsanto with respect to the operation and mission of the laboratory.

In any event, we fail to see how the submission of P–103 in confidence and solely for evaluation purposes, even to a poten-

tial competitor of Radioptics, is a violation of any obligation expressed in the proprietary legend. If the gravamen of the complaint is that the review of P–103 was tainted by competitive jealousy, the terms of the proprietary legend in no way imposed any duty upon the AEC to even evaluate P–103, let alone to obtain a fair evaluation of it. That duty was a mere moral obligation flowing from the gratuitous promise made at the May 1963 meeting that the proposal, if submitted, would be given consideration. Moreover, the record as a whole establishes that the review of P–103 by the Mound Laboratory personnel was, in fact, not tainted, but was objective and fair. If, on the other hand, Radioptics is asking this court to hold, as a matter of law, that the submission of P–103 to Radioptics' competitor, Monsanto (even though in complete compliance with the literal meaning of the terms under the proprietary heading), exceeded the authority of the AEC to use the information in evaluating the proposal, this court would have to stretch and distort beyond all recognition the plain and obvious meaning of the terms of the unilateral caveat sought to be imposed by Radioptics. To read such a limitation into the legend would be totally incompatible with the evaluation procedure to which Radioptics should have expected the proposal would be subjected. To give permission on the one hand to have P–103 evaluated, but on the other hand prohibit evaluation by a Government contractor (even though a competitor) would, in this case, have effectively left no adequately qualified entity to evaluate P–103. Practically all contractors who were knowledgeable about uranium enrichment were in privity, in one way or another, with the AEC. In addition, contractors not only were competing with each other for AEC funding, but also were competing with AEC's own in-house research laboratories for such funds. Conversely, the AEC laboratories were competing with outside private research laboratories, including Radioptics, for available funds.

We conclude, therefore, that even if Mound Laboratory, like almost all other potential reviewers, was a competitor of Radioptics for AEC funding, the submission of P–103 to Mound Laboratories, rather than some other facility, was insufficient to constitute a breach of the terms of the proprietary legend.

Radioptics also alleges that the disclosure restriction was violated when the reviewers at Monsanto's Mound Laboratory circulated their technical evaluation report to various employees at the laboratory. Radioptics is of the view that the report incorporated so much of the substance of P–103 that it was substantially a copy of P–103, and that the distribution of the copy was for purposes other than technical evaluation of P–103.

At the Mound Laboratory, Messrs. Kenneth Foster and Dale Coffey were given the responsibility by their superiors to prepare a report evaluating the technical feasibility of the process disclosed in P–103. Apparently, the report, after completion, was circulated to Walter J. Haubach, their immediate supervisor; David L. Scott, Mound Laboratory Director; W. B. Creamer, Director of Monsanto's Dayton (regional) office, and Dr. G. Richard Grove, Monsanto's Division Director. The report as ultimately sent to the AEC in Washington was not the circulated report, but was a report prepared by Dr. Grove. An inference may be drawn that those to whom the report was circulated were intended to have had the opportunity to contribute their comments to the review prepared by Dr. Grove, and thus were merely part of the evaluation process at Monsanto's Mound Laboratory. On the other hand, it may be inferred that the report passed through the various echelons as a matter of protocol until it reached the AEC in Washington. Whatever, in fact, the reason for circulation may have been, Radioptics did not establish that the circulation was for any purpose other than technical evaluation, or that it was actually used for another purpose. To interpret Radioptics' grant of permission for outside technical review so narrowly as to preclude such a procedure, we think, would be to construe the meaning of that grant at variance with the intent behind it. Clearly, Radioptics had to expect that evaluation of its proposal

would involve a certain amount of administrative paper shuffling, and we do not feel that that amount was exceeded in this case. Accordingly, we hold that the circulation was not a violation of the restriction against unauthorized disclosure.

Radioptics also complains that the AEC did not take adequate steps to protect the confidentiality to which P–103 was entitled under the statute. Although the terms of the proprietary legend did not expressly require any protective precautions to be maintained, we nevertheless find that the "in confidence" requirement, as used in the second sentence of the legend, is the equivalent of the statutory requirement. Absent express language in the legend as to the magnitude of the precautionary measures required, we conclude that the taking of reasonable precautions would be required to satisfy the requirements which are implicit in the statute. We find further that reasonable precautions to protect the confidentiality of P–103 *were* taken, and consistently so. In particular, every document received in evidence which related to the contents of P–103, including P–103 itself, was clearly stamped "CONFIDENTIAL" by the AEC. In addition, the Mound Laboratory personnel, who prepared the report reviewing P–103, were advised that the information disclosed in the proposal was to be maintained in confidence. At each step of the way, the confidential nature of the proposal was made clear and was respected. Although at one time the AEC was unable to locate the whereabouts of one of the copies of P–103, the evidence showed circumstances which indicated that this copy may have been destroyed. To be sure, there was no credible evidence which establishes as a fact that P–103 was seen by anyone except those persons having legitimate authority to see it. We think, therefore, that the evidence is insufficient to establish a breach of any express or implied reasonable precaution requirement, even if such obligation existed under any contract theory, including a bailment theory.

## B. *Fifth Amendment Taking*

Radioptics' second theory of liability is that the Government, through the AEC, has taken its private property for public use without just compensation, in violation of the fifth amendment to the Constitution of the United States. Specifically, Radioptics argues that by declassifying the contents of a patent application of another party (the Levy, *et al.* application), which disclosed subject matter virtually identical with that of P–103 while maintaining the process disclosed in P–103 in a classified status, the AEC had destroyed the property value of P–103 when the Levy, *et al.* patent application issued as a patent, thereby divulging the entire substance of Radioptics' concept to the public and also giving the owners of the Levy, *et al.* patent a position of exclusiveness and competitive advantage over plaintiff.

Radioptics also urges that declassification of the Levy, *et al.* application gave its owners a competitive advantage over Radioptics, since the owners of the application were not under restraint and Radioptics, on the other hand, was prohibited from disclosing the contents of its proposal.

Assuming that P–103, prior to classification, was "property" within the meaning of that word as used in the fifth amendment, and assuming further that the "property" had value at that time, the issue is whether or not, under the facts recited above, there was a "taking" of that property.

■ The law is well established that not every interference with or encroachment upon a private property right by the Government is entitled to compensation under the fifth amendment. Only when there is severe diminution in the value of the property or physical possession, use, or destruction thereof will compensation ordinarily be awarded. *See Mosca v. United States*, 189 Ct.Cl. 283, 289–90, 417 F.2d 1382, 1385–86 (1969), *cert. denied*, 399 U.S. 911, 90 S.Ct. 2197, 26 L.Ed.2d 565 (1970); *De-Tom Enterprises, Inc. v. United States*, 213 Ct.Cl. 362, 365, 552 F.2d 337, 339 (1977).

In the present case, classification of P–103 did not *prohibit* use of the contents thereof by Radioptics, but merely imposed

*security restrictions* on disclosure of its contents to others as mandated by statute and duly promulgated regulations. Specifically, Radioptics was required to modify its safe and to install an alarm, but then only in the event that it wished to retain and store the actual document or copies thereof on its premises. Radioptics was, in any event, prohibited from discussing the detailed contents of the proposal with persons outside of Radioptics without first obtaining permission from the AEC. (Even this restriction did not apply to discussions of a general nature.) To be sure, Radioptics could have conducted the research proposed in P–103 on its own; it could have applied for a patent directed to the process disclosed in P–103; and it could have solicited funds from private investors to help pay for any of these activities, all while P–103 remained classified. Thus, the mere fact of security classification of P–103 did not prevent Radioptics from protecting or enhancing the value of its property. Radioptics solicited the financial aid of defendant to carry forward its research and development, reserving for the anticipated formal contract the terms and conditions under which defendant could duplicate, use, or disclose the submitted data. However, no such formal contract was ever executed. We find this level of interference with Radioptics' property rights, if any, in P–103, insufficient to constitute a taking under the fifth amendment for which Radioptics would be entitled to compensation.

The Supreme Court was presented with an analogous set of facts in *Goldblatt v. Hempstead,* 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962). Petitioner challenged a regulatory action which required him to enclose a portion of his land with a wire fence on the grounds that it was an unconstitutional taking of property without compensation. Even though the regulatory action imposed other even more severe restrictions on petitioner's use of his land (such as a restriction on use of the land for mining and a requirement as to certain berm and slope thereon), the Supreme Court found that the regulation was not "so onerous as to constitute a taking which constitutionally require[d] compensation." *Id.* at 594, 82 S.Ct. at 990. So, too, here we find that the classification of P–103 did not sufficiently interfere with Radioptics' property rights in P–103 to constitute a taking under the fifth amendment for which Radioptics is entitled to compensation.

This conclusion is fortified by the fact that the purpose behind the statute authorizing classification was to assure the common defense and security of the nation. *See* 42 U.S.C. § 2161. This court has pointed out in *Franco-Italian Packing Co. v. United States,* 130 Ct.Cl. 736, 745–46, 128 F.Supp. 408, 414 (1955), that where the purpose of a regulation which causes interference with property rights is to prevent injury to the public welfare as opposed to merely bestowing upon the public a nonessential benefit, compensation under the fifth amendment is not required.

Thus, the purpose of the security classification, as well as the minimal extent of its interference with Radioptics' property rights, militate against a finding that compensation is owing Radioptics under the fifth amendment for the mere act of classification of P–103 or the failure to declassify it at its own behest.

Even if the security classification constituted a taking, recovery would be barred by the 6-year statute of limitations.[17] Radioptics was notified in 1963 that P–103 was classified, but suit was not brought in this court until 1975. The interval of 12 years is not only ground for invoking the statute of limitations, but also may be sufficient to support a defense of laches.

Radioptics argues that, in any event, compensation is due under the fifth amendment by reason of the express provisions of the Atomic Energy Act of 1954. In support of this argument, Radioptics cites 42 U.S.C. § 2181.[18] In that section, however, only

---

17. *See* 28 U.S.C. § 2501.

18. § 2181 states: "Inventions relating to atomic weapons, and filing of reports—Denial of patent; revocation of prior patents

paragraphs (a) and (b)[19] provide for compensation, and then only where there has been a *revocation* of existing patent rights. In the present case, security classification of P–103 did not effectuate revocation of any existing patent rights owned by Radioptics, since Radioptics never filed an application for a patent on any of the matters disclosed in P–103. Thus, we fail to see how section 2181 provides a basis upon which Radioptics is entitled to recovery.

The only other section of the Atomic Energy Act potentially applicable to this case is 42 U.S.C. § 2187(b)(3)[20] which permits compensation to be awarded to any person making a discovery useful in the production of special nuclear material upon application to the Commission. Radioptics never filed an application for compensation under this section and, in any event, Congress has not given this court jurisdiction to provide compensation pursuant to that statute.

Although the mere classification of P–103 is not sufficient to give rise to a compensa-ble claim under the fifth amendment, Radioptics argues that the AEC's continued maintenance of the proposal in classified status, while failing to accept or reject it until after its contents became publicly known as a consequence of the acts of others, effectively prevented Radioptics from exploiting or protecting the disclosed process in the interim, and that this constituted a taking of a sufficient magnitude to entitle Radioptics to compensation under the fifth amendment.

We conclude that the failure of the AEC to either accept or reject P–103 in a timely fashion, did not, in any way, deprive Radioptics of its property rights in P–103. Apparently, Radioptics was not interested in exploiting those rights except through AEC, else it would have sought permission to exercise those rights through others.

Radioptics further argues that this alleged taking was aggravated when, during the period of time in which P–103 was still in classified status, the AEC declassified a

---

"(a) No patent shall hereafter be granted for any invention or discovery which is useful solely in the utilization of special nuclear material or atomic energy in an atomic weapon. Any patent granted for any such invention or discovery is revoked, and just compensation shall be made therefor.

"(b) No patent hereafter granted shall confer any rights with respect to any invention or discovery to the extent that such invention or discovery is used in the utilization of special nuclear material or atomic energy in atomic weapons. Any rights conferred by any patent heretofore granted for any invention or discovery are revoked to the extent that such invention or discovery is so used, and just compensation shall be made therefor.

"(c) Any person who has made or hereafter makes any invention or discovery useful in the production or utilization of special nuclear material or atomic energy, shall file with the Commission a report containing a complete description thereof unless such invention or discovery is described in an application for a patent filed with the Commissioner of Patents by such person within the time required for the filing of such report. The report covering any such invention or discovery shall be filed on or before the one hundred and eightieth day after such person first discovers or first has reason to believe that such invention or discovery is useful in such production or utilization.

"(d) The Commissioner of Patents shall notify the Commission of all applications for pat-ents heretofore or hereafter filed which, in his opinion, disclose inventions or discoveries required to be reported under subsection (c) of this section, and shall provide the Commission access to all such applications.

"(e) Reports filed pursuant to subsection (c) of this section, and applications to which access is provided under subsection (d) of this section, shall be kept in confidence by the Commission, and no information concerning the same given without authority of the inventor or owner unless necessary to carry out the provisions of any Act of Congress or in such special circumstances as may be determined by the Commission."

19. *Id.*

20. § 2187(b)(3) states: "Any person making any invention or discovery useful in the production or utilization of special nuclear material or atomic energy, who is not entitled to compensation or a royalty therefor under this chapter and who has complied with the provisions of section 2181(c) of this title may make application to the Commission for, and the Commission may grant, an award. The Commission may also, upon the recommendation of the General Advisory Committee, and with the approval of the President, grant an award for any especially meritorious contribution to the development, use, or control of atomic energy."

U. S. patent application[21] which contains disclosure material almost identical to that set forth in P–103. This declassification, Radioptics argues, had a two-fold detrimental effect: First, by removing classification encumbrances from the patent application, the owner of the application was given a competitive edge over Radioptics and, second, the public disclosure resulting from the issuance of the patent totally destroyed any remaining value in the contents of P–103.

■ Although declassification of the Levy, *et al.* patent application may have had a detrimental effect on plaintiff's property rights in P–103 when the patent subsequently issued in 1973, it is well established in the law of trade secrets that the public is at liberty to discover trade secrets by fair and legitimate means and, upon discovery, use the subject matter with impunity. *See, e. g., E. I. du Pont de Nemours & Co. v. United States*, 153 Ct.Cl. 274, 286, 288 F.2d 904, 911 (1961). Thus, although the issuance of the Levy, *et al.* patent application may have, in fact, rendered Radioptics' property less valuable or even valueless as a trade secret, in the eyes of the law there has been no taking of trade secret property.[22] Inasmuch as there has been no taking, there can be no compensation due Radioptics under the fifth amendment.

Whatever minimal competitive disadvantage Radioptics may have suffered as a consequence of declassification of the Levy, *et al.* patent application, Radioptics could have overcome that disadvantage by exercising the right of declassification of P–103 in accordance with the declassification guideline changes effected in 1967. This it did not do. Thus, it was Radioptics, not the AEC, who was responsible for whatever competitive disparity, if any, which arose between Radioptics and the owners of the Levy, *et al.* patent application and patent issued thereon. We conclude, therefore, that declassification of the Levy, *et al.* pat-

ent application, without concurrent declassification of P–103, did not give rise to a claim for compensation under the fifth amendment.

Radioptics' final argument is that the Government directly used and disclosed to others the process disclosed to the AEC in confidence by Radioptics, for purposes other than evaluation of the proposal, and thus committed a taking of Radioptics' property without compensation in violation of the fifth amendment. However, as pointed out herein, this course of action would give rise to a cause of action, if any, only for breach of an implied contract, rather than for just compensation for an eminent domain taking.

We conclude that Radioptics is not entitled to compensation under the fifth amendment under any view of the facts of this case, in the light of the applicable law.

### C. *Promissory Estoppel*

■ In the absence of express acceptance by the AEC of the terms of the proprietary legend, Radioptics alleges that the Government is liable on a theory of promissory estoppel. Although we have some reservation whether a claim based upon promissory estoppel is within this court's jurisdiction under 28 U.S.C. § 1491, the evidence in this case wholly fails to establish the elements of a claim on this basis.

The essence of Radioptics' claim is that the AEC impliedly promised that it would not use or disclose to others any of the information contained in P–103 (except for evaluation purposes) by receiving and evaluating the proposal of which the proprietary legend was a part. Even assuming that it can be fairly said that the AEC, expressly or impliedly, ever made such a promise, the evidence fails to establish that the AEC ever breached such a promise. Moreover, in order for the theory of promissory estoppel to apply, a plaintiff must

---

**21.** Levy, *et al.* application serial No. 25,605, filed March 25, 1970, now patent No. 3,772,519.

**22.** Even if, for example, Radioptics had filed an application for patent and both Levy, *et al.* and

Radioptics sought declassification and only the Levy, *et al.* application was declassified, it is still doubtful if there could be said to have been a "taking" of the Radioptics' application.

demonstrate that, in reliance upon the alleged promise of the defendant, plaintiff acted in a manner which the promisor should have *reasonably* expected and was damaged by the promisor's breach of the promise. In the present case, Radioptics claims that it refrained from applying for a patent or otherwise exploiting the process disclosed in P–103, to its detriment, in reliance upon defendant's promise not to use or disclose to others the information contained in P–103 except for the purpose of evaluating the proposal. To the extent that Radioptics actually refrained from exercising its available rights, we find that there was no reasonable expectation by the AEC that Radioptics would be, or was, in any way obligated to refrain from using the information for its own purposes. The promise which the Government had allegedly made could not, in any event, have prevented independent discovery by others of the process disclosed by P–103, and such independent discovery could have destroyed any value P–103 might have had. For Radioptics, then, to have refrained from exploiting the P–103 process on the basis of such an assumed promise was, therefore, wholly at its own risk.

Nevertheless, Radioptics claims that it "relied" on AEC's implied promise in refraining from making any other use of its information because the AEC was the only potential customer, and that if the AEC was not interested in P–103, no one else could be. The problem with this argument is that it is self-defeating. If AEC was the only potential customer, the information would be useless in the hands of others. Accordingly, Radioptics would not be damaged by disclosure to others. We find the doctrine of promissory estoppel inapplicable to the present case.

### D. *Misappropriation of a Trade Secret*

 Misappropriation of a trade secret is a tort and, as such, this court is without jurisdiction to grant relief on such a claim, *see Schillinger v. United States*, 155 U.S. 163, 15 S.Ct. 85, 39 L.Ed. 108 (1894); *McCreery v. United States*, 161 Ct.Cl. 484

(1963). Accordingly, we express no opinion on the merits, if any, of this allegation.

### VI. *Summary*

In rendering judgment in this case, we have assumed that Radioptics had a property right in the contents of P–103 which was subject to legal protection under appropriate circumstances. We hold, however, that the facts of this case fail to warrant recovery either for a taking of Radioptics' property for public use without compensation under the fifth amendment or for breach of contract. Accordingly, judgment is entered for the defendant, and the petition is dismissed.

### CONCLUSION OF LAW

Upon the foregoing opinion, which is adopted by the court, the court concludes as a matter of law that plaintiff is not entitled to recover and the petition is dismissed.