PER CURIAM.
 

 The judgment
 
 *
 
 of the Claims Court is affirmed and the cause is remanded to the
 
 *1352
 
 Claims Court for further proceedings to determine the quantum of recovery, as stated in the judgment itself.
 

 OPINION
 

 This action is brought to recover damages for breach of an express or implied contract. The appellant
 
 **
 
 submitted to the United States Geological Survey (USGS) an alleged trade secret or technology for a novel use of aerial photographs to produce orthophotoquads or photographic maps of selected terrain quadrilaterals. Appellant submitted to USGS an “unsolicited proposal” which disclosed as trade secrets the novelties of technique it had devised, and samples of orthophotoquads that showed what it could do. It included with the proposal a “restrictive legend” which forbade the use or disclosure of the material for any other purpose except to evaluate the proposal. A regulation of the Department, which appellant followed, prescribed how an unsolicited proposal should be worded to incorporate such a restrictive legend, and prohibited departmental personnel from disclosing, or using the secrets for purposes other than evaluation. Appellant’s proposal sought a contract for production of orthophotoquads by it for the government. Ensuing negotiations failed to generate any express written bilateral contract and eventually appellee is found to have disclosed the trade secrets in course of inviting proposals by third parties, and such disclosure resulted in contract awards to such parties.
 

 The Claims Court held, contrary to appellant’s contentions, that no contract, express or implied in fact, was awarded to appellant for government acquisition or use of the claimed trade secrets, or for production of orthophotoquads. We consider this conclusion to be amply supported by the findings of fact and record. The Claims Court also found as a factual and legal conclusion that the parties entered into an enforceable contract implied in fact, that appellee would not reveal the secret data except for evaluation, and that such commitment was violated by appellee, necessitating further proceedings to determine the quantum of recovery. On this theory it entered judgment for appellant. These conclusions are also well supported in the findings of fact and record. We do not repeat everything said by Judge Wood, but rather adopt his findings of fact and opinion as the basis of our decision.
 

 The enforcement of government contracts implied in fact is old in the jurisprudence of the former Court of Claims, whose precedents are binding on us. Some are succinctly summarized in
 
 Griffin v. United States,
 
 215 Ct.Cl. 710, 713 (1978). Before Congress in the statute, presently 28 U.S.C. § 1498, consented to suits for patent infringement by the United States on an eminent domain theory, such suits were dealt with as based on contracts implied in fact, when an inventor had submitted his invention to the United States, expecting it to be tried, and the United States had used it, expecting to be called on to pay.
 
 E.g., Berdan Fire-Arms Mfg. Co. v. United States,
 
 25 Ct.Cl. 355 (1890), 26 Ct.Cl. 48 (1890),
 
 aff’d,
 
 156 U.S. 552, 15 S.Ct. 420, 39 L.Ed. 530 (1895). The classic case of trade secrets submitted in confidence but circulated to competing vendors, is
 
 Padbloc Co. v. United States,
 
 161 Ct.Cl. 369 (1963). There is also some parallel to the instant situation in the disappointed contract bidder cases, holding the government breached a contract implied in fact to consider bids fairly on their merits.
 
 Heyer Products Co. v. United States,
 
 135 Ct.Cl. 63, 140 F.Supp. 409 (1956);
 
 Keco Industries, Inc. v. United States,
 
 428 F.2d 1233 (Ct.Cl.1970). The Claims Court judge rightly relies on
 
 Pad-bloc
 
 as his on-point authority, and there is nothing new in the instant holding. We reject the government argument that the
 
 *1353
 
 claim sounds only in tort. The case is of course necessarily adjudicated as a contract case, and this fact will necessarily influence the measure of damages. We also reject its contention that the impact of these cases is limited by
 
 Radioptics, Inc. v. United States,
 
 621 F.2d 1113 (Ct.Cl.1980). Appellee wrongly concludes from that case that no contract implied in fact arises from submission of trade secrets under a restrictive legend pursuant to a regulation providing for observation of the restriction by government personnel. The most the case holds is that there was no contract implied in fact not to submit the secrets to authorized parties for evaluation, as the restrictive legend expressly permitted. We also reject the contention that the claim is under a contract implied in law.
 

 All other issues briefed and argued by the parties have been considered and we know of no error that necessitates reversal.
 

 The findings of fact and conclusions of law of then Trial Judge Wood are omitted, but have been furnished to the parties. The recommended opinion of Judge Wood follows.
 

 AFFIRMED AND REMANDED
 

 WOOD, Trial Judge:
 

 In this action plaintiff, throughout the period here relevant a small Florida company engaged in the business of aerial photography, sues to recover, alternatively, damages for defendant’s asserted breach of an agreement, express or implied, to maintain the confidentiality of certain allegedly proprietary data or “technology”; damages for defendant’s asserted breaches of contract, express or implied, with respect to acquisition of the said “technology”; or just compensation for a Fifth Amendment taking of the said “technology”.
 
 [1]
 

 Defendant denies that plaintiff possessed any protectable “trade secrets”; it advances a host of arguments in support of the broad contention that the “technology” in question was not a novel trade secret, but was in fact in the public domain. Defendant adds that there was no agreement on its part not to disclose the “technology”, but that in any event defendant did not disclose it, that there was no contract, express or implied, respecting defendant’s acquisition of the “technology”, and that there was no constitutional taking of the “technology”.
 

 The facts of the case will be stated as succinctly as possible consistent with understanding.
 
 [2]
 
 On those facts, and for the reasons hereinafter appearing, it is concluded that defendant is not liable to plaintiff for either breach of a contract to acquire plaintiff’s “technology” or a taking. It is further concluded, however, that defendant did breach an agreement to maintain the confidentiality of plaintiff’s “technology”, to plaintiff’s detriment, and that plaintiff is accordingly entitled to recover.
 

 I
 

 The “technology” here involved relates to the production of an orthophotoquad, a word which requires explanation. Geometrically speaking a quadrangle, or “quad”, is a plane figure consisting of four points, no three of which are collinear, connected by straight lines. For present purposes, however, a “quad” is basically the area of land on one atlas sheet charted by the United States Geological Survey (“USGS”).
 

 An orthophotoquad, a product of aerial photographs taken at various exposure stations, represents a depiction of a portion of the surface of the earth with distortions due to various causes removed. Usually, USGS orthophotoquads
 
 [3]
 
 are of quadrangles
 
 *1354
 
 of the surface of the earth bounded by 7V2 minutes of latitude and 7V2 minutes of longitude; such a quadrangle is called a
 
 “Th-
 
 minute quadrangle”. At most latitudes of the continental United States, a 7
 
 [1]
 
 /2-minute quadrangle is significantly longer in a north-south direction than in an east-west one; this phenomenon is attributable to the fact that the lines of longitude converge.
 
 [4]
 

 During the period here relevant, USGS’s customary procedure for the making of or-thophotoquads involved the taking of aerial photographs of a quadrangle from an altitude of about 40,000 feet along a north-south flight line running down the center of the quadrangle to be mapped. In this procedure, photographic film was exposed at three stations, one at the center of the north boundary of the quadrangle, one at the center, and one at the center of the south boundary. The center exposure covered the entire quadrangle; each of the other two exposures covered approximately 60 percent of it.
 

 When the three overlapping photographic exposures were placed into an instrument (called an orthophotoscope), two separate three-dimensional images, called “models”, were created. One “model”, made from the exposures taken at the center of the north boundary of the quadrangle and at its center, covered the northern half of the quadrangle; the second, made from the exposures taken at the center and at the center of the south boundary, covered the southern half of the quadrangle. These models were then “scanned” in the orthophotoscope to bring all of the images in the exposures to a single common scale.
 

 In most of the orthophotoscopes USGS utilized for orthophotoquad production in 1976 and 1977, separate scanning of each model was required, and the resulting pieces of film had to be spliced together, or mosaicked; in one such machine (the T-64), however, the two models could be scanned on one piece of film, without any need for mosaicking. For obvious reasons, USGS’s method of producing orthophotoquads thusly was called the “double model” method.
 

 In the early part of 1976, Mr. Eugene Marley, a photogrammetrist of wide experience, conceived an idea, believed to be unique and original, for the production of single model orthophotoquads. In brief terms, Mr. Marley’s “single model” method involved the taking of aerial exposures along an east-west flight line from two substantially separated exposure stations, one to the east of the center of the quadrangle, and the other to the west of the center of the quadrangle, so that each exposure covered the entire quadrangle. The two overlapping exposures created a single “model”; scanning of that single model resulted in the production of an orthophoto-quad without a need for mosaicking, and without a join line.
 

 In February 1976, Mr. Walter J. McFadden, plaintiff’s president at all times here relevant, Mr. Marley, and the president of Robinson Aerial Surveys, a corporation with which Mr. Marley was associated, met to discuss the possibility of producing and marketing single model orthophotoquads. The parties (who were of the opinion that they might be able to exploit the new “technology” both commercially and with USGS) agreed to keep the “technology” confidential, that plaintiff would own the “technology”, and that plaintiff (and Mr. McFadden) would be responsible for its proper business development and marketing.
 

 At a June 2-3,1976 conference in King of Prussia, Pennsylvania, Mr. McFadden and Mr. Marley displayed two orthophotoquads (one of “the Leesburg [Virginia] quad”, and the other of “the Norristown [Pennsylvania] quad”) made by or for plaintiff utilizing the single model “technology”. These orthophotoquads were of excellent quality. Mr. Peter Bermel, Chief of USGS’s Eastern Mapping Center, saw the orthophotoquads, discussed them with Messrs. McFadden and
 
 *1355
 
 Marley,
 
 [5]
 
 and, in substance, requested that plaintiff submit to USGS a description of the technology by which they had been produced.
 

 On August 4, 1976, Mr. Bermel received from plaintiff an “unsolicited proposal for a demonstration of orthophoto quad production with superwide angle technology”, and two orthophotoquads. This proposal became known as, and will be referred to hereinafter as, Unsolicited Proposal 776-8 (“UP 776-3”). The cover sheet of the unsolicited proposal provided in part that “This data shall not be disclosed outside the Government or be duplicated, used or disclosed in whole or in part for any purpose other than to evaluate the proposal * * * >>
 
 [6]
 

 In essence, UP 776-3 proposed what was termed to be, and what is here found to be, a “new technique” for the production of orthophotoquads utilizing single model technology. In brief terms, plaintiff essentially proposed the taking of two substantially separated photographs from an aircraft flying along an east-west flight line, with each exposure covering all of the same quadrangle,
 
 [7]
 
 and the use of the resulting exposures to produce a single stereo model from which the entire quadrangle could be scanned beyond the principal points
 
 [8]
 
 to produce an orthophotoquad without a join line, and without any need for mosaicking.
 
 [9]
 
 As submitted, UP 776-3 was sufficiently complete and specific in describing plaintiff’s technology as to be in a form capable of use by USGS. Indeed, as will appear hereinafter, UP 776-3 (as subsequently modified by mutual agreement) was in fact put to some “use” by USGS.
 

 Shortly after Mr. Bermel’s receipt of UP 776-3, he sent it to the four key individuals in USGS whom he believed should be involved in evaluation of the proposal. It was then evaluated by USGS personnel who, in October 1976, found that it contained “new, novel, or unique ideas or approaches not previously * * * ” considered by USGS. Shortly thereafter, the Chief, Branch of Photogrammetry, found that USGS had a requirement for work in the general area covered by UP 776-3,
 
 [10]
 
 and recommended that negotiations toward an agreement with plaintiff (albeit not in the
 
 *1356
 
 precise form proposed by UP 776-3) leading toward the production of single model or-thophotoquads be undertaken.
 

 On December 9, 1976, Messrs. McFadden and Marley, for plaintiff, and a number of USGS representatives, met in Reston, Virginia, to discuss UP 776-3. Plaintiff was told that USGS was not interested in negotiating a contract to the extent proposed in UP 776-3,
 
 [11]
 
 but that USGS was interested in funding a contract pursuant to which plaintiff would produce 175 to 200 single model orthophotoquads from photography to be furnished by USGS. USGS also indicated an interest in obtaining the right to utilize and disclose the “technology” involved in such production. Plaintiff has not proven, however, that any express or even implied contractual undertaking with respect to either the production of orthopho-toquads by plaintiff or the acquisition by defendant of the right to utilize and disclose plaintiff’s technology came into being at or as a result of the December 9, 1976 meeting.
 

 From mid-December 1976 to early May 1977, there were, so far as this record shows, no communications between plaintiff and USGS. USGS was, however, active respecting UP 776-3. USGS personnel began trying to locate some 175 to 200 quadrangles that could be used in contract negotiations with plaintiff, and, ultimately, decided to (and did) prepare a high-altitude flight plan, and flight design work sheets, for a number of quadrangles in Montana, using east-west flying, with several exposures as described on a diagram prepared by USGS. Significantly, a document prepared in January 1977 at USGS’s Rocky Mountain Mapping Center reflected that exposures 2 and 4, at approximately one-fourth, and three-fourths, of the distance from the eastern edge of each of the quadrangles covered by the east-west flight plan to the western edge of the quadrangle “can be used to scan the entire quadrangle as a single unit and eliminate mosaicking.”
 
 [12]
 

 As of 1977, USGS did not have any airplanes of its own; to obtain the aerial photography used in conjunction with the production of orthophotoquads, USGS had to contract for such photography. One purpose of the Montana project was to acquire photographic exposures that could be furnished to plaintiff (should negotiations between USGS and plaintiff toward a contract for the production of single model orthophotoquads prove successful) for the production of the 175 to 200 single model orthophotoquads discussed at the December 9,1976 meeting. To that end, the preparation of specifications drawn so as to delineate the desired aerial photography within the Montana project, and of contract documents for its procurement, were necessary.
 

 Such specifications and contract documents were prepared by USGS and, on April 27, 1977, USGS issued IFB 5927, an invitation for bids for furnishing aerial photography, in accordance with the terms, conditions, provisions and schedules described therein, and USGS standard specifications for aerial photogrammetric mapping (as modified by the IFB) covering the Montana project. The IFB was mailed by USGS to 24 prospective bidders, all of whom were engaged in the business of high-altitude photography.
 
 [13]
 

 The facts next to be stated in summary form are, it is recognized, in sharp dispute; what follows are those which, in the trial judge’s best judgment, are established by a preponderance of the credible evidence.
 

 First, the technology proposed by plaintiff in UP 776-3 can be defined, in substance, as a method for obtaining photo
 
 *1357
 
 graphic exposures for the production of single model orthophotoquads, with the photographic exposures to be taken at two substantially separated éxposures along an east-west flight line, with each exposure covering the same 7V2-minute quadrangle, and with the actual production of the ortho-photoquad from the single stereoscopic model involving scanning beyond the principal points (and the absence of a join line).
 

 Second, IFB 5927 (and particularly its specifications relating to the aerial photography for the Montana project) differed substantially from any aerial photography defendant had ever done (or sought to have done for it) prior to April 27, 1977; no previous photographic plan (as conceived, as implemented, or both) prepared by USGS had incorporated in combination all of the essential components of the methodology called for by IFB 5927.
 

 Third, IFB 5927 was intended to obtain photographic exposures of at least 200 or so quadrangles using an east-west flight line; for each 7V2-minute quadrangle, two exposures, each covering the entire quadrangle, were to be taken from substantially separated exposure stations along that flight line, in such a manner that the production of single model orthophotoquads utilizing those exposures would involve scanning beyond the principal points. IFB 5927’s specifications so providing were based upon, and derived directly from, the contents of UP 776-3 (as modified by agreement December 9, 1976).
 

 Fourth, IFB 5927 disclosed, to any reader of its contents knowledgeable in the field of photogrammetry, plaintiff’s methodology or “technology” for the production of single model orthophotoquads as defined above, and as contained in UP 776-3, as that proposal had been modified by agreement on December 9, 1976.
 

 Finally, the methodology, or technology, described in UP 776-3 (as modified) was new, novel, unique, proprietary to plaintiff, and (to the publication of IFB 5927) secret. It was not in the public domain, by reason of either obviousness, prior use of such technology by USGS (or anyone else), prior publication disclosing such technology, or public disclosure by plaintiff.
 

 In this connection, it is significant that to, and after, the publication of IFB 5927, highly knowledgeable officials of USGS recognized that plaintiff’s said technology was new, unique, proprietary, and worthy of acquisition by USGS; the only real question then was how much defendant should pay for the right to use and disclose the technology. That evidence is far more persuasive here than governmental denigration of the novelty and worth of the technology following germination of the seeds of this lawsuit.
 
 Cf. Canadian Commercial Corp. v. United States,
 
 202 Ct.Cl. 65, 79 (1973).
 

 Bid opening on IFB 5927 was set for May 25, 1977. As of that date, USGS had received two bids; after some delay, a contract pursuant to IFB 5927 was awarded to Mark Hurd Aerial Surveys, Inc., low bidder on IFB 5927, June 29, 1977. Mark Hurd completed the said contract in 1979. Mark Hurd was responsible for, and performed, only aerial photography; it did not engage in any production of orthophotoquads from the photographs taken pursuant to its contract with USGS.
 
 [14]
 

 In the meantime, plaintiff requested and received from USGS a copy of IFB 5927. On May 11, 1977, after having reviewed that copy, Mr. McFadden twice spoke by telephone with the Chief of Procurement, Section B, Branch of Procurement and Contracts, USGS; USGS’s Chief of the Branch of Photogrammetry participated in one of those conversations. It suffices to say that nothing said or done by USGS personnel during either of the conversations amounted to an express or implied undertaking with respect to either the production of orthophotoquads by plaintiff or the acquisition by defendant, pursuant to contract, of
 
 *1358
 
 any “ideas” contained in UP 776-3.
 
 [15]
 
 All of the discussions at that time were in terms of future possibilities, not of present agreement.
 

 Efforts toward a contract between plaintiff and USGS for the production of single model orthophotoquads by plaintiff, and the acquisition by defendant of the right to use and publicize what the Chief of Procurement termed the “production techniques” set forth in UP 776-3, continued for a time after May 11, 1977, but ultimately failed.
 

 In late May 1977, USGS did prepare a sole-source procurement justification, emphasizing the uniqueness of plaintiff’s technology, and the proprietary rights USGS would acquire by contracting with plaintiff for the right to use and publicize that technology. On June 2,1977, USGS promulgated formal findings and determinations pursuant to statute respecting plaintiff’s “new concept” and the preclusion of competition by the proprietary legend on UP 776-3.
 
 [16]
 
 It is, however, clear that no express or implied contractual undertaking covering the production by plaintiff of single model orthophotoquads and the acquisition by defendant of the right to use and publicize the contents of UP 776-3 ever came into being.
 

 II
 

 One line of argument strenuously advanced by plaintiff is that on or about December 9, 1976, or alternatively on or about May 11,1977, plaintiff and defendant entered into an “express contract”. In December 1976, according to plaintiff, the USGS agreed to purchase from plaintiff the right to plaintiff’s technology, and thereafter to furnish to plaintiff “certain photographic products”, with plaintiff to perform “certain production work”. As plaintiff sees it, USGS agreed to pay to plaintiff a “reasonable price for the performance and the technology.” Plaintiff concedes that actions to “document the contract as Mr. McFadden understood it”, including the matter of agreement upon price, remained to be resolved, but says that nonetheless an express contract for the acquisition of plaintiff’s technology arose, and should be enforced.
 

 Assuming no express contract arose December 9, 1976, plaintiff alternatively contends that “an express agreement did arise on May 11, 1977 between the parties.” At that time, it is insisted, the parties agreed to a “present contract” for the sale by plaintiff, and the acquisition by USGS, of plaintiff’s technology, albeit at a still undetermined price to be negotiated at some other time. And, assuming no express contract on December 9,1976, or May 11, 1977, plaintiff then contends that USGS’s publication of IFB 5927, and its consequent disclosure of the technology in UP 776-3, “amounts to a ‘taking’ of private property by the Government without just compensation.”
 

 There is no merit whatever to plaintiff’s express contract contentions. Nor is the claim of taking a valid one.
 

 All else aside, the record evidence respecting the asserted December 1976 and May 1977 “express”, “present”, agreements simply does not support plaintiff’s arguments. On both occasions, there was, at best, an agreement to try to agree in the future.
 
 Colonial Metals Co. v. United States,
 
 204 Ct.Cl. 320, 327, 494 F.2d 1355, 1359 (1974);
 
 National By-Products, Inc. v. United States,
 
 186 Ct.Cl. 546, 560, 405 F.2d 1256, 1264 (1969). Plaintiff has failed to prove that any express (or for that matter implied) contract covering the acquisition by USGS of plaintiff’s technology for the production of single model orthophotoquads came into being at, or as a result of, the December 9, 1976 meeting between representatives of plaintiff and representatives of USGS. Nor did the May 11, 1977, conversations between Mr. McFadden and USGS representatives result in any such
 
 *1359
 
 agreement.
 
 Colonial Metals Co. v. United States, supra.
 

 [17]
 

 Nor does plaintiff fare any better on its taking theory. Where defendant affects private property of a sort within the purview of the Fifth Amendment by its actions, the essential inquiry is whether the injury to that property “rises to the magnitude of an appropriation of some interest in [the] property permanently to the use of the Government.”
 
 National By-Products, Inc.
 
 v.
 
 United States, supra,
 
 186 Ct.Cl. at 577, 405 F.2d at 1273-74.
 
 See also Radioptics, Inc. v. United States,
 
 223 Ct.Cl. 594, 618-24, 621 F.2d 1113, 1126-69 (1980);
 
 Sun Oil Co. v. United States,
 
 215 Ct.Cl. 716, 768-72, 572 F.2d 786, 817-19 (1978). Defendant’s actions with respect to plaintiff’s technology did not amount to a taking of private property for a public purpose within the meaning of the Constitution.
 

 Ill
 

 Plaintiff also contends that, in the circumstances of this case, defendant was under an express or implied contractual obligation, enforceable in this court, to maintain the confidentiality of (and not to use) proprietary data contained in UP 776-3, but that defendant failed to comply with such obligation, to plaintiff’s detriment, when defendant disclosed the said proprietary data to the general public by promulgating and distributing to prospective bidders IFB 5927.
 

 Many of defendant’s answering arguments (that, because of obviousness, lack of novelty, secrecy, or originality, prior knowledge and use by USGS, prior publication, and prior public disclosure by plaintiff, the “technology” in question was not, in defendant’s words, a “protectable trade secret”, but was, rather, in the public domain; and that in any event defendant did not disclose or use the said “technology”), essentially turn on considerations which are factual in nature. Those factual questions, noted and heretofore resolved adversely to defendant, need not receive any further attention at this point.
 

 Defendant also strenuously contends that no agreement, express or implied, to maintain the confidentiality of any “trade secret” (or not to use it) existed. When defendant’s position in this respect is carefully scrutinized, however, it is clear that that position has no merit.
 

 As of 1976, it was the official policy of the Department of the Interior (and of USGS) to encourage the submission of unsolicited proposals containing relevant new ideas. To that end, valid departmental regulations emphasized the importance of so handling such proposals as to encourage disclosure to the government of ideas “originated, conceived, or developed” by prospective contractors, and specified not only that an offeror might submit to defendant data not to be disclosed to the public for any purpose, or used by defendant for any purpose other than evaluation of a proposal, but how to do so, by way of a restrictive legend. 41 C.F.R. § 14-4.5101-2(c), 3(a) (1977).
 
 [18]
 

 In submitting UP 776-3 to defendant, plaintiff attached to it, in substantially the same words as appearing in the relevant regulations,, a restrictive legend. When USGS received UP 776-3, it accepted it, studied it, and recognized and undertook to fulfill an obligation to safeguard its contents against public disclosure. Distribution of UP 776-3 was initially limited to only four persons in USGS, and shortly thereafter USGS’s Branch of Procurement and Contracts made it known that
 
 all
 
 copies of UP 776-3 should be collected and delivered to it. Clearly, as the Chief of USGS’s Branch of Photogrammetry put it, USGS knew that plaintiff’s method or technique for production of single model orthophotoquads was “of a confidential], proprietary nature”, and so regarded it at the time.
 

 
 *1360
 
 In these circumstances, it is more than fair to conclude that there was a meeting of the minds: defendant might either use any data submitted to it by plaintiff to the extent provided in any
 
 subsequent
 
 contract, or use
 
 any
 
 information contained in plaintiffs data that had been obtained from another source without restriction, whether or not there was such a subsequent contract, but defendant otherwise was scrupulously to safeguard the confidentiality of the data in accordance with the terms of the restrictive legend that accompanied it, and not to use it unless permitted to do so by the terms of the legend itself.
 
 Griffin v. United States,
 
 215 Ct.Cl. 710, 713-14 (1978).
 

 As this court has held in an analogous situation, “That is certainly what plaintiff reasonably thought and what the defendant had every reason to believe the plaintiff would think. The defendant, for its part, could not reasonably assume that it would receive plaintiff’s secret data without any * * * obligation to protect their secrecy.”
 
 The Padbloc Co. v. United States,
 
 161 Ct.Cl. 369, 378 (1963). Defendant not only did not so assume, but in fact affirmatively recognized that such an obligation on its part did exist. The real difficulty is that a breach of that obligation occurred; the secret data was used by defendant, and “just plain got out.”
 

 Plaintiff’s methodology or technology as contained in UP 776-3 was secret, unique and proprietary. Defendant was under a clear obligation, pursuant to a binding agreement within the jurisdiction of this court to enforce,
 
 [19]
 
 to maintain the confidentiality of that methodology or technology, and to use it only under specified circumstances.
 
 See Russell Corp. v. United States,
 
 210 Ct.Cl. 596, 609, 537 F.2d 474, 482 (1976),
 
 cert. denied,
 
 429 U.S. 1073, 97 S.Ct. 811, 50 L.Ed.2d 791 (1977);
 
 The Padbloc Co. v. United States, supra.
 
 Defendant failed to live up to its obligation, and is accordingly liable to plaintiff for damages resulting from the defendant’s disclosure and use.
 
 Griffin v. United States, supra; The Padbloc Co. v. United States, supra.
 

 While defendant has advanced a multitude of contentions why a contrary result should obtain here, those contentions fall on close analysis.
 

 Defendant’s basic error is the assumption that, since the restrictive legend which accompanied UP 776-3 referred to the possibility of an award of a contract in the future, the submission of the unsolicited proposal itself could not have been intended to, and did not, create any enforceable rights and obligations between the parties. The government’s logic is faulty. The mere reference in a proviso to the possibility of a future contract (resulting from or in connection with the submission of an unsolicited proposal) clearly does not negate an obligation not to disclose (and not to use) the data contained in the submission in the interim.
 

 Defendant’s reliance on
 
 Radioptics, Inc. v. United States, supra,
 
 is misplaced. In that case, in a factual context differing sharply from that present here, the court held that defendant “never violated any of the restrictions sought to be imposed on the AEC by Radioptics * * To be sure, there are observations that the submission of a proposal was not an offer to sell (a proposition not in dispute here), and that a mere governmental failure affirmatively to reject the terms of a proprietary legend “did not create an implied-in-fact contract embodying those terms.” The essence of the decision was, however, that Radioptics had “utterly failed to prove” a violation of “any of the restrictions or obligations” sought to be imposed by it upon defendant.
 
 Id.,
 
 223 Ct.Cl. at 612, 621 F.2d at 1123. That case is of no comfort to defendant here.
 

 Defendant’s selective reference to binding departmental regulations omits relevant portions of those regulations, but in any event the proposition asserted (that an un
 
 *1361
 
 solicited proposal is merely — and no more than — an effort to induce negotiations toward a future contract) is a variation of another of defendant’s arguments, heretofore considered and rejected above. As noted above, the mere fact that there is a reference, in an unsolicited proposal (or, more accurately, in an accompanying restrictive legend) to the possibility of a future contract does not free defendant of an obligation to safeguard (and not to use) confidential and proprietary data in the unsolicited proposal on (and after) its receipt.
 

 This is not to say that the simple fact of attachment of a restrictive legend to UP 776-3, in and of itself, ineluctably precluded USGS from all disclosure or use of any data in that proposal. The “provided” clause of the restrictive legend makes it clear that that notion is not a valid one. When defendant disclosed (or used) data in the unsolicited proposal, however, the risk of breach of the terms of that legend was (and should be) on defendant, not on plaintiff. One who has disclosed assertedly proprietary ideas to defendant for consideration in accordance with the terms of valid departmental regulations authorizing it to do so, and promising that in that event defendant “shall comply with the terms of the legend,”
 
 [20]
 
 has the right to assume that defendant will honor its commitment or be responsible for any failure to do so.
 

 Defendant further urges that “neither party intended that any actions undertaken by them should constitute implied acceptance of a contract.” This line of argument confuses the concept of a contract to
 
 acquire
 
 plaintiff’s technology with that of an agreement not to disclose to the public what was, in fact, plaintiff’s own methodology or technology (absent a contract giving defendant the right to do so).
 
 [21]
 

 Cf. American General Leasing, Inc. v. United States,
 
 218 Ct.Cl. 367, 587 F.2d 54 (1978).
 

 In that light, this argument, and the related one that certain elements essential to the formation of a contract to acquire plaintiff’s methodology or technology are not established by the proof, lack any substance. Finally, in this connection, while defendant may be right in saying that no one with whom plaintiff dealt had authority to purchase its technology, if valued as plaintiff valued it, there is no real question of the existence of ample authority to agree not to disclose (and not to use without consent) plaintiff’s technology.
 

 The essence of this case is that defendant extended to plaintiff a valid and authorized invitation to submit an unsolicited proposal containing ideas originated, conceived, or developed by the plaintiff. Defendant prescribed how, on submitting such a proposal, plaintiff might indicate that it did not want its ideas disclosed to the public. And, it stated that all government personnel “shall comply with the terms of the legend * * * ” restricting such disclosure (and unauthorized use). Plaintiff accepted defendant’s invitation. Consideration for the governmental obligations resulting from that acceptance existed, and, upon a breach of those obligations (as here), a right to monetary damages from defendant resulting from that breach is enforceable in this court.
 
 [22]
 

 Accordingly, to the extent stated above, plaintiff is entitled to recover. Absent a stipulation or other agreement as to the amount of such recovery, the amount of such recovery is to be determined in further proceedings.
 
 [23]
 

 *
 

 Pursuant to order of this court dated October 4, 1982, the Claims Court, on October 8, 1982,
 
 *1352
 
 entered a final judgment in accordance with Judge Wood’s recommended decision of June 29, 1982. The opinion of Judge Wood, formerly Trial Judge Wood, is reported only in 30 Cont. Cas.Fed. (CCH) ¶ 70,108.
 

 **
 

 While Airborne Data is called appellant, and the United States appellee on this court’s docket, actually we have cross-appeals by both parties to adjudicate.
 

 [1]
 

 . Trial Judge C. Murray Bernhardt presided at trial of, and closed proof in, this case prior to his retirement.
 
 Cf.
 
 Rule 147(b). Trial was duly limited to the issues of law and fact relating to plaintiff’s right to recover, reserving determination of the amount of recovery, if any, for further proceedings.
 

 [2]
 

 . The many evidentiary conflicts were resolved to the best of the trial judge’s ability. The statement of facts in this opinion will include those facts deemed established by a preponderance of the credible evidence, and will at times be somewhat conclusory in nature.
 

 [3]
 

 . In 1976-77, USGS predominated in the production and distribution of orthophotoquads.
 

 [4]
 

 . Thus, the farther one proceeds in a northerly direction away from the equator, the more the phenomenon increases.
 

 [5]
 

 . While Mr. Bermel was told (or deduced) that the orthophotoquads had been produced from aerial exposures taken from a Piper Aztec airplane flying in an east-west direction at an altitude of approximately 25,000 feet, and that a superwide angle lens had been used, he was not told, and did not then know, that the ortho-photoquads were “single model” ones. Neither he, nor anyone else from USGS, was then aware of the “technology”, or concept, by which they had been produced.
 

 [6]
 

 . This restrictive language substantially tracked the words of the “legend” contained in 41 C.F.R. § 14 — 4.5101-3(a)(1) (1977). The cover sheet further provided that if, as a result of or in connection with the submission of the data, a contract should be awarded to plaintiff, defendant should have the right to duplicate, use, or disclose the data to the extent provided in that contract, and that “this restriction” did not limit defendant’s right to use any information contained in such data if it were obtained by defendant from another source.
 

 [7]
 

 . The precise locations at which the photographic exposures were to be made could easily be calculated from the information in UP 776-3, but were not (and perhaps could not) be identified any more definitely than they were; such locations necessarily varied from quadrangle to quadrangle, depending on a number of factors.
 

 [8]
 

 . The concept of scanning beyond the principal points, explained in the findings, is one USGS had never really used, and in fact did not approve; USGS believed that, especially in areas of high relief, scanning beyond the principal points violated accepted photogrammetric principles.
 

 [9]
 

 . UP
 
 776-3 also suggested (among other things) certain other elements
 
 (e.g.,
 
 low-flight altitude, superwide angle photography, a gyro-stabilized camera platform, and aero-triangulation). As plaintiff recognizes, defendant never had any interest in the first two of these named elements and never contemplated that plaintiff would perform any aerial photography for defendant.
 

 [10]
 

 . In November 1976, the Deputy Chief, Office of Research and Technical Standards, USGS, stated that the idea of producing an orthopho-toquad from a single model “is new and attractive to us”, and in December 1976 USGS concluded that an adequate sole-source justification for procurement of plaintiffs technology could be developed.
 

 [11]
 

 . USGS stated (among other things) it was not interested in the use of superwide angle photography from a flight altitude of about 25,000 feet, or in the use of plaintiff’s own aerotriangulation.
 

 [12]
 

 . The author of that document had learned of plaintiffs technology sometime between November 1976 and January 1977, and had been warned that the said technology was proprietary and confidential.
 

 [13]
 

 . The relevant portions of the IFB (quoted in the findings) need not be repeated here. Plaintiff was not among the 24 recipients of IFB 5927, but learned of its issuance by May 6, and of its precise contents by May 11, 1977.
 

 [14]
 

 . There is no indication in the record that any single model orthophotoquads have been produced from Mark Hurd’s aerial photography pursuant to the 1977 contract.
 

 [15]
 

 . The Chief of Procurement did express to Mr. McFadden regret that, in IFB 5927, plaintiff’s methodology or “idea” “just plain got out.”
 

 [16]
 

 . The post-June 2, 1977, facts and circumstances need not be included here. It suffices to say that negotiations toward a contract broke down, and that this action followed.
 

 [17]
 

 . Other arguments by defendant against an express (or implied) agreement for the acquisition of plaintiff’s technology can be, and are, pretermitted.
 

 [18]
 

 . The regulations went on to provide that all government personnel “shall comply with the terms of the legend * * 41 C.F.R. § 14-4.-5101-3(a)(2) (1977).
 

 [19]
 

 . The agreement, whether viewed as express or only implied-in-fact, is well within the purview of 28 U.S.C. § 1491 (1976). Griffin v.
 
 United States, supra,
 
 and authorities cited there. Defendant’s assertion that no more than a contract implied-in-law (and therefore not within the court’s jurisdiction) can be found is an erroneous one.
 

 [20]
 

 . 41 C.F.R. § 14-4.5101-3(a)(2) (1977).
 

 [21]
 

 . Defendant’s right to use any information in UP 776-3, if obtained from another source, was, of course, also not limited by the terms of UP 776-3.
 

 [22]
 

 . As noted hereinabove, defendant’s lengthy brief contains a host of contentions. Any not specifically treated herein have been considered and found to lack merit. Defendant’s claim that Trial Judge Bernhardt improperly admitted certain evidence at trial is not a valid one.
 
 Cf. Moore v. Telfon Communications Corp.,
 
 589 F.2d 959, 965-66 (9th Cir.1978).
 

 [23]
 

 .
 
 Cf.
 
 the Act of April 2, 1982, Public Law No. 97-164, 96 Stat. 25
 
 et seq.,
 
 creating a Court of Appeals for the Federal Circuit and a United States Claims Court, effective October 1, 1982.