Douglas H. **PRESSMAN,** Plaintiff,

v.

The **UNITED STATES,** Defendant.

No. 93–41C.

United States Court of Federal Claims.

May 11, 1995.

William E. Kenworthy, Washington, DC, for plaintiff.

Carol L. Wallack, with whom were Asst. Atty. Gen., Frank W. Hunger and David M. Cohen, Washington, DC, for defendant.

## OPINION

BRUGGINK, Judge.

This is an action for breach of contract. Plaintiff, Douglas H. Pressman, alleges that the Agency for International Development ("AID") agreed, in exchange for his submission of an unsolicited proposal, not to disclose confidential information contained in the proposal. The agency then violated that agreement by disclosing the information, he alleges. The matter is before the court on the defendant's motion for summary judgment. There are arguably disputed issues of fact, such as whether relevant government personnel had requisite authority, whether there was confidential information in the proposal, whether the government's conduct would have constituted a breach of contract, and whether plaintiff suffered any damage. After considering the extensive written record and the parties' oral argument, however, the court concludes that there are no material facts in dispute with respect to the fundamental question of whether a contract ever came into existence. For the reasons set forth below, the defendant's motion for summary judgment is granted.

## BACKGROUND

For purposes of addressing defendant's motion, the court assumes that Mr. Pressman could establish the following facts. In February 1985, Mr. Pressman left his job with an American commercial bank. He had spent six years engaged in international banking and finance, including four years in Thailand. In early 1985, Mr. Pressman was in the process of drafting a business plan for promoting the investment of venture capital in Thailand. During this time, he and an acquaintance, George Hooker, entered into a "verbal understanding" that they would form a partnership called Thai Venture Partners ("TVP"). Although a formal partnership never came into existence, the two men's actions, insofar as relevant here, were undertaken as if a partnership did exist. Due to confusion with the name of another business, the entity's name was subsequently changed to New Venture Associates ("NVA"). Messrs Pressman and Hooker perfected a plan by which TVP would serve as a managerial and operational link between an American venture capital fund and investments in Thailand. Mr. Pressman showed his business plan to various people in 1985 in an attempt to stimulate their interest.

On a September 1985 visit to Thailand, Mr. Pressman, at the suggestion of Mr. Hooker, contacted Lawrence Brown, the Regional Private Enterprise Officer for the AID's Bureau for Private Enterprise ("PRE") in Asia. Mr. Brown's primary responsibility was to inform the AID missions in Asia about the PRE's programs aimed at promoting the development of private enterprise in Asian countries. Although Mr. Brown reported to the mission's Thailand office director, Dr. John Eriksson, no one within the PRE had higher responsibility in the Thailand mission than Mr. Brown.

At the request of Mr. Pressman, he and Mr. Brown met at the AID office. During the meeting, Mr. Brown informed Mr. Press-

man that the PRE offered grants and assistance for projects in developing countries. Mr. Pressman then explained his plan for putting together a venture capital program in Thailand. The plan contained novel ideas and proposals for linking American venture capital with business opportunities in Thailand. Mr. Brown was interested in Mr. Pressman's plan because it was compatible with AID's charter.

During this initial meeting, Mr. Pressman gave Mr. Brown two copies of the plan. Although Mr. Brown indicated that there would be no trouble obtaining funding for the plan because it was precisely what the PRE was looking for, the two men did not negotiate any terms for a grant or loan to TVP. Nor is there is any contemporaneous, written document evidencing an agreement of any kind. According to Mr. Pressman, it was his understanding that a group of employees in Washington, D.C. was responsible for deciding whether to grant money in response to requests for funds. Moreover, Mr. Pressman understood that Dr. Eriksson did not have the authority to grant him money.

On the cover of TVP's business plan was the legend, "Strictly Confidential." There is also some circumstantial evidence that a separate, inside page contained the following: [1]

THIS DOCUMENT IS CONFIDENTIAL AND CONTAINS INFORMATION AND DATA WHICH IS PROPRIETARY ("PROPRIETARY INFORMATION") TO THAI VENTURE PARTNERS AND ITS OFFICERS, WHETHER OR NOT PATENTABLE OR COPYRIGHTABLE, INCLUDING, BUT NOT LIMITED TO IDEAS, STRATEGIES, METHODS OF OPERATION, MARKETING AND PROMOTIONAL PLANS, AND THE IDENTITIES OF MANAGEMENT PERSONNEL OR OTHER INDIVIDUALS INVOLVED WITH THAI VENTURE PARTNERS. THE OFFEREE, BY ACCEPTING DELIVERY OF THIS DOCU-MENT, AGREES TO PROMPTLY RETURN IT AND ANY ACCOMPANYING MATERIALS TO THAI VENTURE PARTNERS UPON WRITTEN REQUEST. ANY REPRODUCTION OR OTHER DISTRIBUTION OF THIS DOCUMENT IN WHOLE OR IN PART, WITHOUT THE PRIOR WRITTEN CONSENT OF THAI VENTURE PARTNERS, IS PROHIBITED.

At their September 1985 meeting, Mr. Pressman asked Mr. Brown to sign a non-disclosure agreement. This non-disclosure agreement had been provided to Mr. Pressman by his attorney, who had cautioned him to protect the confidentiality of the information contained in his business plans. Although Mr. Brown stated that he did not have authority to sign the private non-disclosure agreement, he assured Mr. Pressman that he need not be concerned about disclosure to persons outside the agency. Mr. Brown indicated that persons in the AID were already prohibited by law from disclosing confidential business information and that by the nature of its activity the agency was constantly in possession of sensitive business information. Although Mr. Pressman did not ask Mr. Brown to cite any specific regulations, based upon these assurances he provided him a copy of the TVP plan.

Mr. Pressman concedes that he and Mr. Brown did not enter into an express, oral, non-disclosure agreement. Moreover, they did not discuss or agree upon any specific terms, such as duration or damages for breach.

In February 1986, using the NVA name,[2] Messrs Pressman and Hooker submitted a more detailed proposal entitled, "Request for U.S.A.I.D. Assistance to Facilitate the Formation of Two Venture Capital Funds for Thailand" ("request" or "request for assistance"). This request essentially proposed

---

1. The government contends that the original copy of the plan delivered to Mr. Brown did not contain this legend, but rather, the copy with this legend was furnished much later, in response to a request by the agency's Inspector General as part of an internal investigation. It is not necessary to resolve this issue.

2. NVA was not incorporated until April 1986. It never had assets, shareholders, officers, or employees, and was never operated in any respect.

the AID's involvement in the plan for developing a joint venture intermediary through grants and loans. The cover page for this document contained the legends, "Proprietary Information" and "Not to be Reproduced." The request was forwarded to the PRE in Washington, D.C.

The court assumes, purely for the sake of ruling on the government's motion, that there is evidence that TVP's business plan, or request for assistance, or relevant information from either of them, was deliberately or inadvertently disclosed by AID officials to Robert Parra, a private individual who was a consultant to the AID and to private entities.[3] It further assumes that Mr. Parra and others, including an AID employee, formed Business Venture Partners ("BVP"), and, using information taken from Mr. Pressman, put together their own proposal for involving the AID in financing a venture capital initiative in Thailand. Mr. Parra's proposal was designated as The Asian I Fund. In March 1987, International Biotechnology Group, a group with which Mr. Parra was apparently connected, submitted a successful proposal to the PRE for a $150,000 reimbursable grant for the development of The Asian I Fund.

In mid-February 1986, Sean Walsh, Director of the PRE's Office of Investment, sent a letter to Mr. Pressman stating that the PRE had decided not to financially support Mr. Pressman's plan for developing a venture capital industry in Thailand.

The court will assume, without deciding, that The Asian Fund I proposal contained unique and confidential material taken from both the TVP/NVA business plan and request for assistance, including, for example, the concepts of "proactive venture origination" and liquidation of investments on the local stock exchange. The court will further assume, without deciding, that Mr. Brown was authorized, by virtue of his AID position,

to accept unsolicited proposals and that he was wrong in asserting that he did not have authority to sign a non-disclosure agreement.

As proof of the AID's alleged policy of protecting confidential and proprietary information, Mr. Pressman relies upon two cable messages from the Secretary of State to the American Embassy in Bangkok. The first, dated April 30, 1986, concerned The Asian I Fund proposal. This cable stated that documentation on the plan would be delivered to the Embassy for review but warned, "This information will have to be closely controlled as it will contain proprietary information on technologies for commercialization in Thailand." The second cable asked the Embassy to contact BVP for permission to disclose certain organizational information to organizers of a similar undertaking in Sri Lanka.

## DISCUSSION

Mr. Pressman contends that an implied-in-fact agreement arose out of the September 1985 meeting. Under the terms of that agreement, AID would, in exchange for submission of Mr. Pressman's business plan, protect the confidentiality of the information contained therein. Because Mr. Brown specifically declined to sign the written confidentiality agreement, Mr. Pressman is forced to argue that the circumstances of their conversation created a contractual relationship by necessary implication from Mr. Brown's position, the role of the PRE, Mr. Brown's willingness to accept the business plan, and the non-disclosure legend.

Any discussion of whether an enforceable agreement not to disclose could have arisen under these circumstances must begin with *Airborne Data, Inc. v. United States,* 702 F.2d 1350 (Fed.Cir.1983). In that case, in circumstances similar to those here, the Federal Circuit found that such an implied-in-fact contract did come into existence. *Id.* at

---

**3.** Mr. Pressman concedes that there is no direct evidence establishing that any AID employee provided Mr. Parra with a copy of his business plan or request for assistance. In his deposition, Mr. Pressman testified that "I'm not saying nor does our second amended complaint allege that a copy of the plan was actually physically given. We're saying that the information submitted by Plaintiff was disclosed by A.I.D., okay?" Mr.

Pressman also admitted that he was merely "speculating" that Mr. Parra had taken "project concepts" from his business plan. Mr. Pressman relies upon the great similarity between The Asian I Fund and TVP's proposal to establish that his confidential information was in fact disclosed. According to his expert witness, the similarity between these two plans was so strong that it could not have arisen by accident.

1352–53. Airborne Data submitted an "unsolicited proposal" to the United States Geological Survey ("USGS") for a novel use of aerial photographs to produce maps. *Id.* at 1352. The proposal cover sheet recited that the proposal contained confidential data, and it bore the legend, "This data shall not be disclosed outside the government or be duplicated, used or disclosed in whole or in part for any purpose other than to evaluate the proposal...." *Id.* at 1355. The trial court found, and the appellate court agreed, that Airborne Data's submission contained unique, proprietary information. *Id.* at 1357.

Subsequently, USGS issued an invitation for bids covering a procurement for aerial photogrammetric mapping. *Id.* at 1356. The award went to an entity other than Airborne Data. *Id.* at 1357. The plaintiff alleged two contracts. One was an agreement to award the procurement to Airborne Data. *Id.* at 1358. The court found that such an agreement did not come into existence. *Id.* at 1358–59. The other was an implied-in-fact agreement not to disclose the confidential data contained in the unsolicited proposal. *Id.* at 1359. The court found that such an agreement was created and that the agency had breached it by crafting the specifications in the invitation for bids directly from Airborne Data's proposal and then releasing the invitation to prospective bidders. *Id.* at 1359–61.

The following findings contained in *Airborne Data* are crucial to its conclusion that a confidentiality agreement arose:

> As of 1976, it was the official policy of the Department of Interior (and of USGS) to encourage the submission of unsolicited proposals containing relevant ideas. To that end, valid departmental regulations emphasized the importance of so handling such proposals as to encourage disclosure to the government of ideas "originated, conceived, or developed" by prospective contractors, and specified not only that the offeror might submit to defendant data not to be *disclosed to the public for any purpose* other than evaluation of a proposal, but how to do so, by way of a restrictive legend.

*Id.* at 1359. The regulations referred to in the court's findings are located at 41 C.F.R. § 14–4.501 (1976). In relevant parts, these regulations stated:

> § 14–4.501–1 Policy. It is the policy of the Department of the Interior to inform the public, organizations, and individuals of scientific and technological areas encompassed by its missions, and to encourage the submission of unsolicited proposals containing relevant ideas....

> § 14–4.501–3 General Provisions. (a)(1) An unsolicited proposal may include data ... which the offeror does not want disclosed to the public for any purpose or used by the Government for any purpose other than evaluation of the proposal. If an offeror wishes to so restrict his proposal, he shall mark the title page with the following legend:

> > This data shall not be disclosed outside the Government and shall not be duplicated, used, or disclosed in whole or in part for any purpose other than to evaluate the proposal....

> § 14–4.501–3(c) If the contracting officer receives an unsolicited proposal marked with a more restrictive legend than that provided in paragraph (a)(1) of this section, he shall immediately return the proposal to the submitter....

These regulations also provided further instructions to both the offeror and to agency personnel on how to preserve the confidentiality of the unsolicited proposal.

In conformance with these · regulations, Airborne Data placed a restrictive legend on its proposal. *Airborne Data*, 702 F.2d at 1359. The court found that the USGS "accepted it, studied it, and recognized and undertook to fulfill an obligation to safeguard its contents against public disclosure." *Id.* at 1359.

Clearly, the court in *Airborne Data* viewed these regulations as constituting not only a de facto solicitation of proposals, but also a simultaneous promise by the USGS to protect the confidentiality of the proposals thereby generated. In this respect, the case recognizes a species of implied-in-fact contract to fairly and honestly consider bids. That contractual theory has its clearest and

earliest expression in *Heyer Products Co. v. United States,* 140 F.Supp. 409, 135 Ct.Cl. 63 (1956). There, the Court of Claims announced the following principle: in the context of a solicitation for bids, "[i]t [i]s an implied condition of the request for offers that each of them w[ill] be honestly considered." *Id.* 140 F.Supp. at 412, 135 Ct.Cl. at 69. The source of the implied promise in *Heyer Products* was thus the solicitation itself.

Because it did not involve a formal solicitation, *Airborne Data* is one step removed from *Heyer Products.* It was not difficult, however, for the *Airborne Data* court to find a de facto solicitation and an explicit promise of confidentiality in the text of the regulations. The USGS welcomed "unsolicited" proposals and set up a method to ensure that confidential data would be identified and protected. The regulations were specifically directed at prospective submitters of proposals. They were the target group for the invitation and the promise.

At this point it is necessary to consider an earlier decision by the Court of Claims, *Radioptics, Inc. v. United States,* 621 F.2d 1113, 223 Ct.Cl. 594 (1980). There, an assertion similar to that made in *Airborne Data* was rejected by the court. *Radioptics,* 621 F.2d 1113, 223 Ct.Cl. at 598. Radioptics had submitted a proposal to the Atomic Energy Commission ("AEC") that was either unsolicited altogether or had been orally solicited from Radioptics only. *Id.* 621 F.2d 1113, 223 Ct.Cl. at 599–600. The proposal contained proprietary data dealing with the separation of uranium isotopes and had a cover legend very similar to the one Mr. Pressman asserts was included in his plan. *Id.* 621 F.2d 1113, 223 Ct.Cl. at 600–01. Personnel within the AEC determined that the proposal was subject to the classification requirements of the Atomic Energy Act of 1954. *Id.* 621 F.2d 1113, 223 Ct.Cl. at 601. As a result of this determination, the stamp "CLASSIFIED" was affixed to each page of the proposal. *Id.* 621 F.2d 1113, 223 Ct.Cl. at 602. Moreover, Radioptics was instructed that it could not reveal aspects of the proposal without agency permission. *Id.* Subsequently, with the permission of Radioptics, the AEC released the

report to some technical reviewers who concluded that the information contained therein was not original. *Id.* 621 F.2d 1113, 223 Ct.Cl. at 602–03. Based upon these conclusions, the AEC later declassified the document. *Id.* 621 F.2d 1113, 223 Ct.Cl. at 604. In the interim, other private individuals had applied for patents utilizing related technology. *Id.* 621 F.2d 1113, 223 Ct.Cl. at 604–05.

Radioptics filed suit, alleging that a contract not to disclose confidential information had come into existence and had been breached by the AEC. *Id.* 621 F.2d 1113, 223 Ct.Cl. at 598. As evidence of this breach, Radioptics pointed to the later work of others in the field. *Id.* 621 F.2d 1113, 223 Ct.Cl. at 608–18. Although the court ultimately held that a contract did not come into existence, it also stated that even if one had come into existence, it had not been breached. *Id.*

As to the question of contract formation, the court relied upon the general proposition that silence does not constitute acceptance of an offer, absent some prior understanding. *Id.* 621 F.2d 1113, 223 Ct.Cl. at 609 (citing 1 Williston on Contracts § 91 (3d ed. 1957)). In response to Radioptics' argument that the AEC's classification of the document constituted proof of its acceptance of an offer implicit in the confidentiality legends on the proposal, the court stated: "the AEC was not acting pursuant to the terms of the 'Proprietary Information' clause, but rather was acting solely in accordance with the statutory requirements of 42 U.S.C. § 2181(e). We conclude, therefore, that the affirmative recognition of the confidentiality of [the proposal] was not an act which created an implied-in-fact contract between the AEC and Radioptics." *Id.* at 610.

Contract formation requires an objective manifestation of voluntary, mutual assent. *See* Restatement (Second) of Contracts § 18 (1979). Assent may be manifested by conduct alone if the party allegedly assenting knows that the other party may infer assent from the conduct. *Id.* § 19. What was missing in *Radioptics* was contractual intent on the part of the agency. There was no indication that the statutory secrecy requirement was enacted as an offer to confidentially con-

sider proposals. Moreover, although the AEC acted consistently with the confidentiality legend, it did so because of the obligations of the Atomic Energy Act, and not because it was accepting an offer by the plaintiff.

The regulations in *Airborne Data*, on the other hand, were not analogous to the secrecy requirements of the Atomic Energy Act. The Department of Interior assumed the requirement of secrecy for the explicit purpose of providing assurances to entities such as Airborne Data that their unsolicited proposals would be protected. The agency was motivated by a desire to generate such proposals. Although the obligations to maintain confidentiality were analogous in both cases, they arose from different motivations. The regulations in *Airborne Data* themselves constituted an open offer to contract—the contract consisting of a promise to maintain confidentiality in exchange for submission of proposals. The offer was accepted by the submission of a proposal that complied with the terms of the regulation.

■ This distinction between *Airborne Data* and *Radioptics* proves fatal to Mr. Pressman's case. No offer can be implied in AID's regulations or Mr. Brown's conduct. The regulations upon which Mr. Pressman relies, and to which Mr. Brown was presumably referring, are found within Title 22 of the Code of Federal Regulations ("Foreign Relations"). Section 10.735–208, "Misuse of Information," is located within Part 10, "Employee Responsibilities and Conduct." This section prevents a government employee, for the purpose of furthering a private interest, from permitting the direct or indirect use of "official information obtained through or in connection with Government employment which has not been made available to the general public." 22 C.F.R. § 10.735–208 (1986). The other two regulations cited by Mr. Pressman, 22 C.F.R. §§ 212.41(d), 215.10 (1986), are similar in effect. They instruct AID employees on their obligations when confronted with a request for disclosure under the Freedom of Information Act, 5 U.S.C. § 552 (1988). While all three provisions are binding on agency employees, their adoption, and compliance with them, does not, by implication, suggest that the agency

is directing an offer to the general public to confidentially consider unsolicited proposals. For the same reason, the "policy" reflected in the cables regarding the confidential treatment of The Asian Fund I proposal is merely a reflection of AID obligations unrelated to any intent to contract.

■ The agency not having made a solicitation to the public at large and Mr. Pressman in particular, there was no offer outstanding that was accepted when Mr. Pressman gave Mr. Brown his business plan. It does not assist plaintiff to view the offer as emanating from Mr. Brown, through his action in bringing the plan to Mr. Pressman. Even assuming that this act constituted an implied offer to submit the plan in exchange for a promise of confidentiality, that offer was never accepted. Mr. Brown rejected any express contract when he declined to sign the confidentiality agreement. His statement to Mr. Pressman that, in so many words, the agency would comply with the law and keep the proposal confidential, is not any indicia of intent to accept an offer to enter into a contract. Mr. Brown's statements simply meant that the agency would be bound, not by an exchange of promises with consideration, but by internal agency policy.

■ Such an agreement would, in any event, fail for lack of consideration. *See* Restatement (Second) of Contracts § 73. A promise by a government employee to comply with the law does not transform statutory or regulatory obligations to contractual ones. The violation of the statute or regulation will not be enforceable through a contract remedy. *See Floyd v. United States,* 26 Cl.Ct. 889, 891 (1992), *aff'd,* 996 F.2d 1237 (Fed. Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 328, 126 L.Ed.2d 274 (1993). Whether viewed as a lack of consideration or lack of contracting intent, the result is the same. No contract arose.

## CONCLUSION

The undisputed facts demonstrate that no contract was formed. Defendant's motion for summary judgment is therefore granted. The Clerk is directed to enter judgment dis-

missing the complaint with prejudice. No costs.